UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>) Criminal No. 1:07-CR-00075-CKK<br>ERICK R. BROWN,  and )<br>MILAGROS L. MORALES, )<br>)<br>Defendants. )<br> ) | |

**DEFENDANTS' JOINT RESPONSE TO
THE UNITED STATES'S MOTION TO REVIEW REPRESENTATION**

Defendants, Erick R. Brown and Milagros L. Morales, through undersigned counsel, respectfully submit this response to the "United States's Motion to Review Representation."

**I.    FACTUAL BACKGROUND**

Mr. Brown and Ms. Morales, both long-standing detectives with the Metropolitan Police Department for Washington, D.C., are before this Court having been indicted on eight criminal charges, including one count of Conspiracy Against Civil Rights in violation of 18 U.S.C. §241, four counts of Conspiracy to Obstruct Justice in violation of 18 U.S.C. §§371 and 1512( c)(2), and three counts of False Statements in violation of 18 U.S.C. §1001.  The Government has now filed a motion asking the Court to review the propriety of the representation of Ms. Morales by attorneys David Schertler and Danny Onorato, premised on the Government's assertion that a conflict of interest may proscribe their continued representation of Ms. Morales.

The Government correctly points out that for an extended period of time prior to the indictment – from February 2005 through December 2006 – Mr. Schertler and Mr.

1

Onorato represented both defendants during the investigation of this matter. Mr. Schertler was first contacted by Detectives Brown and Morales in February 2005, shortly after they were removed from the investigation into the murder of Terrance Brown, which occurred on February 12, 2005. Before taking on the representation in February of 2005, Mr. Schertler advised Detectives Brown and Morales of the potential conflict and suggested that they consider hiring a separate attorney to represent one of them in this matter.[1] Detectives Brown and Morales expressed to Mr. Schertler that they did not want separate representation, but rather felt that their interests in this matter were identical and wished to be represented jointly by Mr. Schertler and Mr. Onorato. Both Detectives were willing at that point to waive any potential conflict and be represented by the same attorneys. In addition, after hearing the Detectives discuss the matter, Mr. Schertler and Mr. Onorato felt confident that their interests were virtually identical and that they had a strong common interest in defending jointly against these allegations.

The investigation into this matter was initially conducted by Assistant U.S. Attorney Virginia Cheatham in the U.S. Attorney's Office for the District of Columbia. After meeting extensively with Detectives Brown and Morales to determine their version of the events, as well as conducting an independent investigation that included interviewing certain witnesses, Mr. Schertler contacted AUSA Cheatham to advise her that the Detectives were willing to cooperate in any investigation. As a result, on April 13, 2005, Detectives Morales and Brown were interviewed, separately, by AUSA Cheatham along with an MPD investigator. Mr. Schertler and Mr. Onorato were present

---

[1] At this time, Mr. Schertler actually contacted another defense attorney to inquire whether that attorney would be willing to represent Detective Brown in this matter. That attorney would have been willing to take on the representation if Detective Brown had so desired.

2

for the interviews, during which each Detective was questioned extensively about the events underlying the allegations against them.

From that time forward, very little work was done on the case as we waited for a decision from the U.S. Attorney's Office. Upon information and belief, AUSA Cheatham submitted to her supervisors a memorandum recommending against any criminal charges. In August 2005, Mr. Schertler was informed that the U.S. Attorney's Office for the District of Columbia had decided to recuse itself from this matter. The investigation was later transferred to the U.S. Attorney's Office for the Western District of Virginia, where it was assigned to Assistant U.S. Attorney William F. Gould. Mr. Schertler had limited contact with AUSA Gould, other than to advise AUSA Gould that the Detectives remained willing to cooperate with his investigation.

On July 17, 2006, AUSA Gould contacted Mr. Schertler and informed him that he intended to bring criminal charges against Detectives Brown and Morales. On July 20, 2006, Mr. Schertler met with Detectives Brown and Morales to advise them of the prosecutor's intention to bring charges. At that meeting, Mr. Schertler also advised both clients that in light of the fact they would be charged with the same conduct, Mr. Schertler and Mr. Onorato would not be able to represent both of them moving forward and that a separate attorney would have to be hired to represent one of them in the event that Mr. Schertler and Mr. Onorato remained as counsel for the other.

On or about July 24, 2006, Mr. Schertler was contacted by Reid Weingarten. Mr. Weingarten informed Mr. Schertler that he had been contacted by Detective Brown about possible representation. Mr. Schertler and Mr. Weingarten had discussions regarding the case. After Detective Brown was advised by Mr. Weingarten, and Detective Morales was advised by Mr. Schertler, of the potential conflict in joint representation moving

3

forward, Detectives Brown and Morales once again waived the conflict for the limited purpose of Mr. Schertler and Mr. Onorato making a presentation to AUSA Gould and U.S. Attorney John Brownlee in an effort to persuade them that criminal charges were not appropriate in this situation. That presentation was made in Charlottesville, Virginia on August 4, 2006. On September 6, 2006, AUSA Gould advised Mr. Schertler that they still intended to pursue criminal charges against the two Detectives, but that his Office would be willing to consider a pre-indictment plea agreement that would involve diversion and the ultimate dismissal of any charges if the Detectives were willing to resign should the Detectives be interested in such an offer.

At this point in time, Detective Brown was being separately advised by Mr. Weingarten. However, it was jointly decided by Detectives Brown and Morales with Mr. Schertler that an appeal of the decision should be made to the Department of Justice. On September 26, 2006, Mr. Schertler sent a letter to Deputy Attorney General Paul J. McNulty requesting a meeting on the matter. Subsequently, Mr. McNulty's staff advised Mr. Schertler that the matter would be addressed by the Department of Justice's Civil Rights Division. Mr. Schertler and Mr. Onorato made another presentation on behalf of both Detectives to Civil Rights Division Deputy Chief David Allred on November 22, 2006, to again demonstrate the reasons why the two clients should not be charged criminally.

Finally, on February 8, 2007, Mr. Weingarten and Mr. Heberlig, acting on behalf of Detective Brown, and Mr. Schertler and Mr. Onorato, acting on behalf of Detective Morales, met with Grace Chen Becker, Deputy Chief of the Civil Rights Division, as well as other civil rights prosecutors, in yet another effort to persuade them that criminal

4

charges were not appropriate in this case. Later in February, attorneys for both clients were advised that charges would be brought against them.

As the Court knows, the indictment was returned on March 21, 2007. Since the indictment, both Detectives Brown and Morales have been advised of the potential conflict of interest that exists in Mr. Schertler and Mr. Onorato remaining as counsel for Detective Morales. Both clients have indicated that they understand that conflict and agree to waive the conflict in order for Mr. Schertler and Mr. Onorato to continue as counsel for Detective Morales.

## II.     LEGAL ANALYSIS

The Government properly brings this issue to the attention of the Court. The prior representation of Detectives Brown and Morales by Mr. Schertler and Mr. Onorato raises a "potential" conflict of interest in their ongoing representation of Detective Morales. We disagree, however, that there is any legal or ethical proscription that would prevent Mr. Schertler and Mr. Onorato from continuing to represent Detective Morales in this matter. Both Detectives have been advised of the potential conflict of interest and have waived that conflict. In fact, we submit that in light of this waiver, it would be reversible error for this Court to disqualify Mr. Schertler and Mr. Onorato, as the attorneys of choice for Detective Morales.

The Government is incorrect in portraying that the representation of Detective Morales by Mr. Schertler and Mr. Onorato presents an "actual" conflict. The Government continues to misunderstand the distinction between an actual conflict and a potential conflict. Nonetheless, well-established caselaw places a responsibility on this Court to make an inquiry, *ex parte*, of Detectives Morales and Brown to (1) satisfy the Court that both Defendants understand the potential conflict and how it might adversely

affect their rights and, (2) to assure that both Defendants knowingly, intelligently and voluntarily waive any conflict. We support such an inquiry.

While we agree that the trial court has an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment, the Government's concern with Ms. Morales' representation by Mr. Schertler and Mr. Onorato is overstated. First, the situation here does not present even close to the degree of conflict that exists when one lawyer represents at trial two codefendants charged with the same conduct. The Supreme Court has stated that even that potential conflict does not necessarily warrant a disqualification of counsel. *Wheat v. United States*, 486 U.S. 153, 161 (1988). In fact, when such joint representation of codefendants occurs, the law does not require that counsel be automatically disqualified. Rather, Fed. R. Crim. P. 44(c)(2) requires that:

> The court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel.

The Government correctly points out that in 1988, the Supreme Court issued its seminal opinion on this question in *Wheat v. United States*, 486 U.S. 153 (1988). The potential conflicts involved in *Wheat* were far more pronounced than those in this case. Defendant Wheat was charged with participating in a drug distribution conspiracy in federal court in San Diego. Shortly before his trial was set to begin, Wheat indicated to the court that he wanted to retain attorney Iredale. Iredale, however, was already actively representing two other defendants charged in the same conspiracy, one of whom – Bravo -- had already pled guilty and was a potential government witness **against** Wheat. *Id.* at 154-155. Iredale's other client – Gomez-Barajas -- had not yet entered any type of guilty

6

plea and the government claimed that if Gomez-Barajas went to trial, the government would be calling Wheat as a witness against Gomez-Barajas. Despite the fact that all three defendants agreed to waive any conflicts, the trial court would not permit Iredale to represent Wheat. After discussing at some length the problems of representing ***joint defendants***, the Supreme Court stated:

> [W]e think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses. In the circumstances of this case, with the motion for substitution of counsel made so close to the time of trial, the District Court relied on instinct and judgment based on experience in making its decision. We do not think it can be said that the court exceeded the broad latitude which must be accorded it in making this decision. Petitioner of course rightly points out that the Government may seek to "manufacture" a conflict in order to prevent a defendant from having a particularly able defense counsel at his side; but trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of decision.

*Id*. at 163.

Unlike this case, *Wheat* involved a situation in which actual conflicts, as opposed to potential conflicts, existed. In *Wheat*, the government indicated that it intended to call one of Iredale's clients as a witness ***against*** the other. Iredale thus had an actual conflict in representing Wheat, given the fact that Iredale's other client, Bravo, would testify against Wheat. No such conflict exists in this case, as there is no reason to expect that either Detective Morales or Detective Brown would offer testimony against one another. In fact, we anticipate that any testimony given at trial by either Detective would be consistent with that of the other, as well as favorable to the other. That was not the situation in *Wheat*. As the *Wheat* Court pointed out:

> Here the District Court was confronted not simply with an attorney who wished to represent two coequal defendants in a straightforward criminal

7

> prosecution; rather, Iredale proposed to defend three conspirators of varying stature in a complex drug distribution scheme. The Government intended to call Bravo as a witness for the prosecution in [Wheat's] trial. The Government might readily have tied certain deliveries of marijuana by Bravo to petitioner, necessitating vigorous cross-examination of Bravo by petitioner's counsel. Iredale, because of his prior representation of Bravo, would have been unable ethically to provide that cross-examination.

*Id*. at 163-64. This is not the case here. There is no reasonable likelihood in this case that one defendant will serve as a witness against the other. Rather this is the case that the Supreme Court refers to as "two coequal defendants in a straightforward criminal prosecution."

Despite the degree of conflict that existed in *Wheat*, which was far greater than in this case, the Supreme Court did not endorse the trial court's disqualification of counsel as the only "correct" resolution.[2] Rather, the Court acknowledged that:

> Other district courts might have reached differing or opposite conclusions with equal justification, ***but that does not mean that one conclusion was "right" and the other "wrong"***. The District court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

*Id*. at 164 (emphasis added).

Another Supreme Court decision that preceded *Wheat* by eight years, *Cuyler v. Sullivan*, 446 U.S. 335 (1980), also addressed potential conflicts of interest raised by representation of defendants charged in a criminal case. In addressing the question of whether a state court had an independent obligation to inquire into a potential conflict, the Court noted:

---

[2] It is worth noting that *Wheat* was a 5 to 4 decision by the Court that included two vigorous dissenting opinions. Justices Brennan and Marshall called the trial court's decision to disqualify counsel "patently incorrect." *Id*. at 166. Justices Stevens and Blackmun criticized the majority opinion and stated that the district court's decision "deprived [Wheat] of a constitutional right of such fundamental character that reversal is required." *Id*. at 173.

> Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in [*Holloway v. Arkansas*, 435 U.S. 475, 485-86 (1978)], trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of trial.'" 435 U.S. at 485, . . . quoting *State v. Davis*, 110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973).

*Id*. at 347. In *Cuyler*, the Court found no violation of the defendant's Sixth Amendment right to counsel by virtue of the fact that his lawyers represented him and his two codefendants, all of whom had been charged with the same murder.

> Holloway reaffirmed that multiple representation does not violate the Sixth Amendment unless it gives rise to an actual conflict of interest . . . [A] reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel. Such a presumption would preclude multiple representation even in cases where "'[a] common defense . . . gives strength against a common attack.'" [citations omitted.]

*Id*. at 348.

In addressing the issue raised by the government in this case, the Court must begin with the fundamental premise that the Sixth Amendment right to counsel includes the right to counsel of choice.

> We have previously held that an element of the [Sixth Amendment right to counsel] is the right of a defendant who does not require appointed counsel to choose who will represent him. See Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed. 2d 140 (1988); Cf. Powell v. Alabama, 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.") The Government here agrees, as it has previously, that "the Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant . . .

*United States v. Gonzalez-Lopez*, --- U.S. ----, 126 S.Ct. 2557, 2561 (2006).

9

> The Sixth Amendment right to effective assistance of counsel has been construed to include the right to secure counsel of choice. . . . The right to counsel of choice is founded in the right of a criminal defendant to control the conduct of his defense because "it is he who suffers the consequences if the defense fails." *Faretta v. California*, 422 U.S. 806, 820, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975).. . . **[T]here is a presumptive right to counsel of choice. . . .**

*United States of America v. Cannistraro*, 794 F. Supp. 1313, 1317 (D.N.J. 1992)(emphasis added).

Similarly, in *United States v. Sabarese*, 1994 U.S. Dist. LEXIS 4047 (D.N.J. 1994), the trial court observed:

> The Court takes a grave view of the government's motions. The circumstances presented here raise issues of constitutional dimension and ethical judgment. . . . . A criminal defendant should be provided the opportunity to secure legal counsel of choice. *Powell v. Alabama, 287 U.S. 45, 53, 53 S. Ct. 55, 58, 77 L. Ed. 158 (1932); United States v. Moscony, 927 F.2d 742, 748* (3d Cir.), cert. denied, *115 L. Ed. 2d 984, U.S., 111 S. Ct. 2812 (1991).* The Sixth Amendment grants to the criminal defendant the right to control the conduct of his defense, of which a vital aspect is the selection of counsel to serve as an advisor and representative. *Faretta v. California, 422 U.S. 806, 820, 95 S. Ct. 2525, 2533, 45 L. Ed. 2d 562 (1975); Moscony, 927 F.2d at 748.* Because the defendant "suffers the consequences if [his] defense fails," *Faretta, 422 U.S. at 820, 95 S. Ct. at 2525,* the Supreme Court has recognized that the Sixth Amendment extends a presumptive right to the counsel of one's choice. *Wheat v. United States, 486 U.S. 153, 159, 108 S. Ct. 1692, 1697, 100 L. Ed. 2d 140 (1988). . . .*

Because a defendant's right to counsel of his or her choice is integral to the constitutional right to counsel, the disqualification of counsel is a draconian remedy that must be imposed upon a criminal defendant only when compelling need exists. For example, in *Interactive Coupon Marketing Group, Inc. v. H.O.T. Coupons*, 1999 U.S. Dis. LEXIS 9004 (N.D. Ill. June 7, 1999), the trial court noted:

> Disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary" and disqualification "motions should be viewed with extreme

> caution for they can be misused as techniques of harassment." *Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 721-22 (7th Cir. 1982).* Accordingly, the burden is on the moving party to show the facts warranting disqualification. *Government of India v. Cook Industries, Inc., 569 F.2d 737, 739-40 (2d Cir. 1978). . . .*
>
> Seventh Circuit case law instructs that motions to disqualify counsel should be approached with caution and should not be granted unless absolutely necessary. [Emphasis added.]

Similarly, in *United States v. Castellano*, 610 F. Supp. 1137 (S.D.N.Y. 1985), Judge Sofaer noted:

> [A defendant's] right to pick his own lawyer . . . [is] a right of constitutional dimension . . . . [and implicates a] defendant's Sixth Amendment rights . . . . Before any such drastic step [*i.e.*, disqualification] is taken, the government must show convincingly that no less intrusive measure can adequately protect the interests it has invoked.

In considering the representation in the present case, the Court must assess with some precision the specific nature of any conflict that may arise. Contrary to the Government's contention, there is no "actual" conflict in this case, but rather a potential that some conflict may arise later in the proceedings.

> A defense attorney has an "actual conflict" when he is "required to make a choice advancing [another client's] interests to the detriment of his client's interest"

*United States v. Gantt*, 140 F.3d 249, 254 (D.C. Cir. 1998)(*quoting United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996)).

> "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'"

*United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002)(*quoting Cuyler,* 446 U.S. at 356, n.3.) An attorney has a potential conflict of interest if "the interests of the defendant

11

may place the attorney under inconsistent duties at some time in the future." *United States v. Kliti*, 156 F.3d 150, 153, n.3 (2d Cir. 1998)

Here, attorneys Schertler and Onorato do not have an actual conflict because the interests of the two clients have been identical and have not diverged up to this point. There exists, however, the potential that an actual conflict might arise should the interests of Detectives Brown and Morales diverge with respect to a (1) material factual issue, (2) a material legal issue or (3) their respective desired courses of action in this case. However, we submit that under the circumstances of this case, there is no realistic possibility that an actual conflict will arise at some point later in the proceedings that would require attorneys Schertler and Onorato to make a choice between conflicting interests of the two Detectives. Moreover, Detectives Brown and Morales are willing to waive any conflict that might arise at a later point in the proceedings.

In a series of cases beginning with *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), the Second Circuit outlined a prudent protocol for trial courts when faced with potential conflicts by counsel's representation. Named after the leading case, this protocol has become known as a "*Curcio* hearing."

> At such a hearing, the trial court (1) advises the defendant of his right to representation by an attorney who has no conflict of interest, (2) instructs the defendant as to the dangers arising from particular conflicts, (3) permits the defendant to confer with his chosen counsel, (4) encourages the defendant to seek advice from independent counsel, (5) allows a reasonable time for the defendant to make a decision, and (6) determines, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risk of representation by his present counsel and freely chooses to run them. . . Thus ultimate goal of these procedures is to permit the court to determine whether the defendant's waiver of his right to conflict-free counsel is knowing and intelligent.

*United States v. Perez*, 325 F.3d 115, 119 (2d Cir. 2003). In *Perez*, the Second Circuit explained:

> Where the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choices as to which right is to take precedence must generally be left to the defendant and not be dictated by the government. . . . To ensure that a defendant's choice is knowingly and intelligently exercised, the district court, after learning of the possibility of a conflict of interest, determines whether the attorney has an actual conflict, a potential conflict, or no conflict at all. . . . If the court discovers no genuine conflict, it has no further obligation. . . At the other end of the spectrum, if the court determines that counsel has an actual conflict that is so severe as to indicate per se that the rendering of effective assistance will be impeded, or is analogous to such a conflict in "breadth and depth," the court must . . . disqualify counsel.  And, if between these two extremes, the court determines that the "attorney suffers from a lesser [actual] or only a potential conflict," then it may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of his choice.

*Id*. at 125.

We submit that this case falls within the final scenario posited by the Second Circuit in *Perez*. In our view, the potential for conflict in this case would develop into an actual conflict under the following scenarios.

1. If Detective Brown were to adopt a course of action shifting blame to Detective Morales and give testimony adverse to Detective Morales thus necessitating that attorneys Schertler and Onorato conduct a hostile cross-examination of their former client in order to impeach him or, alternatively create a potential that attorneys Schertler and Onorato would not vigorously cross-examine Detective Brown because of their former relationship with him.

2. If Detective Morales were to adopt a course of action shifting blame to Detective Brown, thus placing attorneys Schertler and Onorato in the position of introducing evidence adverse to their former client;

3. If either Detective were inclined to enter into an agreement with the Government and provide testimony adverse to the other; thus placing

13

attorneys Schertler and Onorato in a position of being adverse to their former client, Detective Brown.

With respect to the first two scenarios, based on the statements that the clients have made to prosecutors in the past regarding the events underlying the criminal charges, there is no realistic possibility of an actual conflict developing. In meeting with AUSA Cheatham, both clients made consistent statements regarding their own involvement and that of the other in the underlying events. In those statements, neither client attempted to deflect blame to the other. In fact, to the contrary, both Detectives consistently maintained that neither of them acted inappropriately in their interactions with the witnesses in the homicide investigation. Both Detectives have described their individual actions as well as that of the other as completely devoid of any intent or attempt to wrongfully or corruptly persuade the witnesses to testify falsely. Should either or both Detectives testify at trial, we would expect that their testimony will remain consistent with that of the other and, equally important, remain favorable to the other. Under these circumstances, not only is there very little chance of an actual conflict arising at trial, but precisely the opposite: The Detectives have an overwhelming common interest in presenting a joint defense.

With respect to the third scenario, if either Detective sought to enter into a cooperation agreement with the Government and provide testimony against the other, an actual conflict would arise in the representation of Detective Morales by attorneys Schertler and Onorato because they would become adverse to their former client, Detective Brown. If Detective Brown were to decide to cooperate and provide testimony adverse to Detective Morales, attorneys Schertler and Onorato would be placed in an actual conflict with Detective Brown. Similarly, an actual conflict would develop if

14

Detective Morales were to wish to enter into an agreement to provide cooperation against Detective Brown. There is virtually no possibility of this. Detectives Brown and Morales were offered a pre-trial plea that would involve dismissal of any charge brought after a period of pre-trial "diversion" and their agreement to resign from the police force. It is hard to conceive of a more favorable disposition, especially when it results in no conviction. Both Detectives have rejected the offer, again maintaining their innocence to any wrongdoing. The likelihood that either one of them would be willing to enter into a cooperation agreement now, which is unlikely to be as favorable as the initial offer, is extremely remote.

Finally, we expect that after being advised by the Court as to the potential conflict of interest in the continued representation of Detective Morales by attorneys Schertler and Onorato, both Detectives will waive any conflict that may arise as the proceedings continue. The Second Circuit in *Perez* addressed this situation:

> [L]esser conflicts, such as an attorney's representation of two or more defendants or his prior representation of a trial witness, are generally waivable. . . Although such a conflict might require a defendant to abandon a particular defense or a line of questioning, he can be advised as to what he must forgo; he "can then seek the legal advice of independent counsel and make an informed judgment that balances the alteration in the trial strategy against the perceived effect of having to get a new and perhaps less effective defense counsel." In the multiple representation situation, the defendant "can be advised by independent counsel of the dangers" of such matters as "one defendant's cooperating with the government," and make a knowing and intelligent decision that he wishes to continue to be represented by his attorney despite the attorney's representation of another accused. . . . Where the defendant can rationally opt to retain counsel of his choice despite a conflict, the court conducts a *Curcio* hearing to determine whether the defendant knowingly and intelligently waives his right to conflict-free representation.

*Id*. at 127.

In this case, we would propose that the Court begin with the following inquiry:

### A.      PROPOSED INQUIRY

Detectives Brown and Morales, prior to the indictment in this case, both of you were represented by Mr. Schertler and Mr. Onorato during the course of the investigation.  During that time, both of you shared confidential and privileged information with Mr. Schertler and Mr. Onorato with respect to the events underlying the allegations that are made against you in the indictment.

Now, after you have been charged by the Government in this case, Detective Brown has hired separate attorneys to represent him, but Detective Morales continues to be represented by Mr. Schertler and Mr. Onorato.

This could raise potential problems as the case proceeds that you need to be aware of – problems that we have referred to as "conflict of interests." If either of you were to object to the continued involvement of Mr. Schertler and Mr. Onorato in this case, I would disqualify them.  In order for them to remain as counsel for Detective Morales, both of you must understand what these conflicts are and how they might impact you, and agree that you would waive any conflicts or problems that might arise later as a result of their involvement.

Detective Brown, if you and your attorneys decided at a later time that it might be to your advantage to argue that you did not commit any crime, but that if a crime was committed, the blame should fall on Detective Morales, or if you should decide to cooperate with the government and testify against Detective Morales, then Mr. Schertler and Mr. Onorato would be obligated to challenge your credibility.  They could introduce evidence or cross-examine you using information you told them while they represented you and use that information to your disadvantage and to the advantage of Detective Morales.  By waiving this conflict, you would essentially agree that they could do that if necessary.

Detective Morales, if you decided that it would be to your advantage to argue that you did not commit any crime, but that Detective Brown was responsible for any wrongdoing, or if you should decide to cooperate with the government and testify against Detective Brown, you would have to be concerned that your attorneys would not provide you with objective advice in that regard because of their pre-existing relationship with Detective Brown.  Furthermore, if Detective Brown were to testify against you and blame you, your attorneys  might not challenge his credibility as vigorously as they should because of their pre-existing relationship with Detective Brown.

> Detective Morales, I want you to understand that you have the right to be represented by an attorney who is looking out for your interests, and your interests alone. An attorney who cares only about what happens to you and no one else. This is an attorney who has no conflicts of interest. Do you understand that right?
>
> If you felt that because Mr. Schertler and Mr. Onorato had represented Detective Brown in this matter that they were not going to represent you as well as they should, you do not have to have them represent you. It is your choice.
>
> But you must also understand that if you decide that you want Mr. Schertler and Mr. Onorato to represent you in this trial, you make that decision knowing that the conflicts I have described above may develop and you will have to live with them even if they work to your disadvantage
>
> I am not saying that the fact that Mr. Schertler and Mr. Onorato represented Detective Brown in the past will in any way affect their representation of you, but there is that possibility that you must be aware of. Do you understand?
>
> And knowing of that possibility, is it your wish to still keep Mr. Schertler and Mr. Onorato as your lawyers in this case?
>
> Detective Brown, should you and your attorneys decide at some point in the future that your best strategy might be to argue and present evidence that if anything was done wrong here, it was done not by you, but by Detective Morales, Mr. Schertler and Mr. Onorato might use information that you provided them while they represented you to discredit you. If you decide to take that approach, the fact that they remain as attorneys for Detective Morales may work to your disadvantage at trial.
>
> Do you understand that if you decide to waive any conflicts, that should this possibility come to be real, you will have to live with the consequences. Knowing of this possibility, do you have any objection to Mr. Schertler and Mr. Onorato remaining in the case to represent Detective Morales?

As *Curcio* instructs, the court must assess whether the waiver is "knowing and intelligent."

> This does not mean that the defendant must be able to predict with certainty which dilemmas will present themselves to counsel or how counsel will resolve them. Defendants need not be prescient. Nor need their decision be what an objective observer would deem sensible,

17

prudent, or wise. The Supreme Court "consistently has 'rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case.'"

*Curcio*, 680 F.2d at 888 (quoting *Edwards v. Arizona*, 451 U.S. 477, 490-91 (1975).

For the reasons set forth above, we respectfully submit that any conflict here is a potential conflict and one that can be waived by both Detectives after being appropriately advised by counsel and the Court.

        Respectfully submitted,

        MILAGROS L. MORALES

        By her attorneys,

        _____/s/_____
        David Schertler
        Danny Onorato
        SCHERTLER & ONORATO, LLP
        601 Pennsylvania Avenue, N.W.
        Suite 900 – NORTH Building
        Washington, D.C.  20004
        Telephone:  (202) 628-4199
        Facsimile:   (202) 628-4177

        ERICK R. BROWN

        By his attorneys,

        _____/s/_____
        Brian Heberlig
        Reid H. Weingarten
        STEPTOE & JOHNSON, LLP
        1330 Connecticut Avenue, NW
        Washington, DC  20036
        Telephone:  (202) 429-8134
        Facsimile:   (202) 429-3902

Dated: April 23, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Motion was delivered by email service list and first class mail, pre-paid, this 23rd day of April 2007 to:

William F. Gould, Esq.
Assistant United States Attorney
Western District of Virginia
2100 Jamieson Avenue
Alexandria, VA  22314
Fax:  703-299-3981




_____/s/_____
David Schertler