# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NUMBER:** |
| | : | **1:2007-cr-00075-CKK** |
| | : | |
| | : | |
| | : | **The Honorable Colleen** |
| **v.** | : | **Kollar-Kotelly** |
| | : | |
| **ERICK R. BROWN, and** | : | |
| **MILAGROS L. MORALES,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## UNITED STATES'S OMNIBUS RESPONSE TO DEFENDANTS' JOINT PRETRIAL MOTIONS

The United States, by and through its attorney, the United States Attorney for the Western District of Virginia, hereby responds to defendants' numerous joint motions that have been filed in this matter. By the government's count, defendants have filed six motions that are currently pending with the Court. Five of these motions are dispositive motions requesting that the Court dismiss either certain counts or the entire Indictment that has been returned by the Court's Grand Jury. These motions, in the order that they have been numbered by defendants, are: Defendants' Motion to Dismiss Counts One Through Eight of the Indictment for Lack of Specificity; Defendants' Motion to Dismiss Counts Two Through Five for Failure to State an Offense Under Title 18, United States Code, Sections 371 and 1512(c); Defendants' Motion to Dismiss Counts Two Through Five of the Indictment for Failure to Allege an Essential Element; Defendants' Motion to Dismiss

Counts Two Through Five for Failure to Allege Cognizable Conspiracies to Violate Title 18, United States Code, Section 1512(c)(2); and Defendant's Motion to Dismiss Counts Two Through Five of the Indictment for Unconstitutional Multiplicity. The last, and sixth, defense submission is a Motion for a Bill of Particulars. The United States opposes all of these motions and respectfully requests that the Court deny them.

I.    Facts

During the morning of February 13, 2005, Terrance Brown was murdered at Club U. Club U, which is no longer in existence, was at that time located in the Reeves Center at 2000 14th Street, N.W., Washington D.C. Mr. Brown was stabbed multiple times in various parts of his body. The cause of his death was an approximately three and one half inch stab wound to his heart. Terrance Brown was attacked by two people. Jerome Jones attacked him with a box cutter, and another individual attacked him as well. The other individual was wearing a black shirt with the brand name "Coogi" on it.

Very soon after Mr. Brown was murdered, a squad of the homicide unit of D.C.'s Metropolitan Police Department (hereinafter "MPD") was assigned to investigate the crime. Milagros Morales was designated the lead detective on the investigation, and a number of her squad members helped the investigation in various ways over the next few days. Almost immediately after Morales was assigned to the murder, Erick Brown began to investigate the case with Morales. In February 2005 both Morales and Brown were detectives assigned to different squads in MPD's homicide unit. Early in the investigation, Morales and Brown interviewed Witness A and Witness B who were both eye witnesses to the murder, as well

as certain events immediately before and after the murder.  These interviews were video-taped by Morales and Brown who conducted the interviews.  During Witness A's interview, and at other times, Witness A described the unknown man in the black Coogi shirt as holding one hand on Terrance Brown's back and the other hand as doing a stabbing motion.  Witness B, among other things, said that Jones was slashing Terrance Brown with a box cutter.  Witness B described the slashing motion in detail to defendants and in the video-taped interview.  In addition, Witness B said that there were a number of men other than Jones attacking Terrance Brown.

Based in part on these interviews, Morales prepared an arrest warrant for Jerome Jones.  The arrest warrant charged Jones with murder one while armed.  On February 15, 2005, Morales and Brown presented this arrest warrant to a supervisor in the homicide section of the U.S. Attorney's Office.  This supervisory AUSA had authority to sign off on arrest warrants within the U.S. Attorney's Office.  After watching the video-taped statements as well as studying other parts of the investigative file that was left for review, this AUSA had concerns about the case and requested that the AUSA be able to interview Witness A and Witness B with defendants.  Brown refused the AUSA's request and pushed the AUSA to sign the warrant without interviewing any of the witnesses.  The AUSA did not take this suggestion.  At one point while defendants were refusing the bring the witnesses to the U.S. Attorney's Office to be interviewed, Brown called Captain C.V. Morris, the head of MPD's

homicide unit, to get permission to make a probable cause arrest of Jones.[1]  This was not approved.  During this interim, a supervisor with the homicide unit who was also at the AUSA's office called the medical examiner to determine if a box cutter could have been the murder weapon that killed Terrance Brown.  The medical examiner confirmed one of the AUSA's concerns by indicating that a box cutter could not have caused the death because the wound was too deep, and the blade of a box cutter is too short and too weak to cut through the bone and cartilage of the chest area.  The medical examiner indicated that a box cutter simply could not have reached Terrance Brown's heart in the way that the fatal wound did.  After some time, a supervisor with MPD ordered Morales and Brown to bring in the witnesses as requested.  Initially they brought in a witness who could provide no information addressing the AUSA's concerns.  This witness had not seen the weapons involved in the fight, and from his description, appeared not to have seen the fight that resulted in Terrance Brown's death.  After this, Brown again pushed the AUSA to sign the warrant for murder one while armed.  The AUSA did not do this, and asked to interview the relevant witnesses.  Brown again refused to bring the witnesses to the U.S. Attorney's Office and was again ordered to bring the witnesses in for an interview with the AUSA.  This time the directive was to bring in Witness A.

Morales and Brown went to get Witness A at Witness A's work and drove Witness

---

[1]     A probable cause arrest is where an officer, believing the he has probable cause that a crime has been committed, arrests a suspect without an arrest warrant approved by the U.S. Attorney's Office and signed by a judge.

A to the U.S. Attorney's Office.  As they were driving to the U.S. Attorney's Office, Morales and Brown pressed Witness A about what Witness A was going to tell the AUSA during Witness A's impending interview.  Witness A said that Witness A was going to say what Witness A had said to defendants previously.  The defendants then told Witness A that "they . . . didn't like the motion I was doing.  . . .  The stabbing motion" by the other man in the black Coogi shirt.  In Witness A's words, "[t]hey said it looked like a stabbing motion and they didn't want [the AUSA] . . . to get the impression that the friend[, the man in the black Coogi shirt,] was doing the stabbing."  At one point, Witness A tried to tell defendants that what they were instructing Witness A to say was not true.  Morales cut Witness A off and said that she did not want Witness A "to fuck up the investigation."  Morales went on to tell Witness A that defendants "need you not to fuck up this investigation and tell, tell [the AUSA] . . . what you told us but don't do that motion."

Defendants also told Witness A that another witness had told them that one of the attackers used a box cutter in the fight.  Defendants told Witness A that they were trying to get this other witness "away from saying box cutter" because Terrance Brown's "wounds couldn't have come from a box cutter."  Witness A testified that "they were trying to – they say [the other witness] . . . was firm on saying box cutter, but they were trying to get [the witness] . . . away from saying box cutter."  When Witness A met with the AUSA immediately after Witness A was told what to say by defendants, Witness A described the other man's, the man in the black Coogi shirt, actions as the detectives instructed Witness

A not the way that Witness A in truth had seen this man act.[2]

The interview with Witness A did not answer the questions that the AUSA had about the case, even though Witness A changed Witness A's version of events as instructed by defendants. The AUSA then asked to interview Witness B. Defendants refused to bring Witness B in to meet with the AUSA and threatened to do a probable cause arrest of Jones. The AUSA informed defendants that probable cause did not exist to arrest Jones. Defendants left the U.S. Attorney's Office. Later that evening, the AUSA received a call from MPD's Commander Michael Anzalla, Superintendent of Detectives, who indicated that probable cause did not exist to arrest Jones at that point and that the AUSA would have an opportunity to interview Witness B.

The evening before Witness B met with the AUSA, defendants met with Witness B at MPD's Violent Crime Branch's (hereinafter "VCB") offices. During this meeting, the detectives told Witness B, among other things, not to tell the AUSA that Jones had a box cutter. Defendants told Witness B to say that what Witness B saw was silver. They also told Witness B not to tell the AUSA about the two other people that fought with Terrance Brown in order to make it appear that Jones was the only one attacking the victim.

The next day Witness B met with the AUSA at the U.S. Attorney's Office. Morales and Captain Morris were also present for the interview. Witness B said that Witness B saw a silver object in Jones's hand during the attack. Witness B also described his attack as a

---

[2]       This conduct, coupled with the facts set forth in the Indictment, constitutes the gravamen of the crimes charged in Count Two and Count Six.

stabbing rather than a slashing motion. In addition, Witness B stated that no one else was anywhere near Terrance Brown and Jones when the fatal fight occurred. At some point during the interview, it because clear that defendants had met with Witness B the night before at the VCB. At this point, Captain Morris and the AUSA asked Witness B to leave the room. While Witness B was out of the room, Morales admitted that defendants had met with Witness B, but she indicated that they had only talked to Witness B about Witness B's description of the box cutter. The AUSA expressed disappointment that defendants had tainted the interview by meeting with Witness B again. Soon after this, Brown came in to the AUSA's office. He had been absent up to this point. Brown admitted that defendants had talked to Witness B about all three points where Witness B had changed Witness B's description of what happened to Terrance Brown: the description of Jones's weapon, the number of people involved in the fight, and the motion that Jones used to attack Terrance Brown. The AUSA again told defendants that they should not have tainted Witness B's interview before the AUSA and Captain Morris could meet with Witness B.[3]

From this interview with Witness B, law enforcement learned that Witness B went to Club U on February 12th and 13th, 2005, with Witness B's friend, Witness C. Defendants went to bring Witness C to meet with Captain Morris and the AUSA. Defendants went to Witness C's work, but before bringing Witness C in for an interview, they interviewed Witness C about what Witness C had seen at Club U. Witness C, among other things,

---

[3]     These false statements in conjunction with defendants' conduct in tampering with Witness B, as well as the facts from the Indictment, are the basis for Counts Three and Seven.

described what Witness C had seen and said that Witness C knew Jones. Witness C told defendants that Jones attacked the victim with a box cutter, confirming Witness B's untainted version of the events. The detectives once again told Witness C not to describe the weapon as a box cutter when Witness C met with Captain Morris and the AUSA. They told Witness C to say that it was a shiny metal object, or to use some similar description but not box cutter. When Witness C met with Captain Morris and the AUSA, Witness C, more than once, began to say box cutter but cut herself off after saying "box cu . . ." and then described Jones's weapon as a shiny metal object. When asked who told Witness C to describe the weapon this way, Witness C, after some hesitation, pointed to Morales and said "she did." Brown was not in the room for this interview.[4]

        Throughout these few days while the AUSA and officials at MPD were deciding whether or not to arrest Jones, defendants pressed the false story that they were asserting through the witnesses summarized above. They claimed that Jones acted alone; that he did not have a box cutter, but a knife, or knife like object; and that he was stabbing Terrance Brown, not slashing him. In sum, they were trying to arrest Jones for a crime that he did not commit, murder one while armed. In addition, they did not tell MPD officials or the AUSA that they were interviewing these witnesses in an attempt to get them to change what they were saying about what they had seen that night, and they failed to provide significant exculpatory evidence to MPD officials and to assistants at the U.S. Attorney's Office. On

---

        [4]        These statements as well as defendants' conduct with Witness C are the basis for Count Four.

February 21, 2005, Brown was instructed not to do any more work on the Club U investigation. After this happened, Morales called Witness B and told Witness B that Brown had been removed from the case and asked Witness B what Witness B would say if asked about what defendants told Witness B to say to Captain Morris and the AUSA. On February 23, 2005, Morales was removed from the case by MPD officials and told to discontinue any work on the investigation. After this Morales called Witness B, informing Witness B that Witness B would have to testify before the Grand Jury. Morales again asked what Witness B planned to say about what defendants had told Witness B to do and say.[5] Morales also asked about Witness B's impending testimony in the Grand Jury. All three witnesses testified in the Superior Court Grand Jury about what they had seen at Club U on the morning of February 13, 2005, and about their interaction with defendants. One witness testified in February and the other two in March. As noted below, all of these transcripts have been turned over to defendants as part of the discovery in this case.

II.    Discovery

The United States has provided counsel for defendants with virtually everything in its possession in this matter, attempting in every instance to be expansive in its interpretation of what is due and discoverable. For example, it has provided all of the information in the undersigned's possession about the underlying prosecution United States v. Jerome Jones, F-6847-05, which was tried in Superior Court this year. In addition, the government has

---

[5]    The conduct summarized in this paragraph relates most directly to the charges in Count Five and Count Eight.

turned over all of the witness statements in its possession, including those to which I refer above. The government has also provided counsel with copies of the video-tapes referred to above, along with transcripts of these tapes. The AUSA referred to at length above wrote a lengthy memo about the AUSA's interaction with defendants. The AUSA wrote this memo immediately after defendants conduct was uncovered. This document has been turned over. In fact, the government has provided witness statements and tapes of witnesses that it will certainly not be calling during this Court's trial. This was done simply to provide context to what other witnesses have said about this matter. In sum, the government would characterize the discovery in this matter as going even beyond what is often characterized as open file discovery. It has been expansive, and it has been provided months before the trial date, which is set for late August 2007. The only documents that have not been provided are those that are the work product of either the undersigned or other lawyers with the Justice Department. Obviously, the Court is aware of one of these documents as it has been provided to the Court ex parte, but with notice to all counsel.

III.    The Grand Jury's Indictment Sets Forth Defendants' Crimes in Significant Detail and Does Not Lack the Specificity Required by the Constitution and Other Applicable Federal Law (Defendants' Motion Number 1).

In their Motion to Dismiss Counts One Through Eight of the Indictment for Lack of Specificity (Defendants' Motion Number 1) (hereinafter, "Specificity Motion"), defendants claim that the Grand Jury's Indictment lacks the specificity required by the U.S. Constitution and Rule 7(c)(1) of the Federal Rules of Criminal Procedure. Specificity Motion at 1. Specifically, defendants allege that the Indictment violates the Fifth and Sixth Amendments

of the Constitution and Rule 7(c)(1).  Id. at 3.

    A.    <u>Specificity</u>

The Sixth Amendment of the Constitution requires that a defendant be "informed of the nature and cause of the accusation."  The specificity requirement that emanates from this clause assures three things:  that a defendant (a) has to answer only to charges that have been brought by the Grand Jury; (b) can adequately prepare his defense; and (c) is protected against double jeopardy. <u>E.g.</u>, <u>United States v. Haas</u>, 583 F.2d 216, 218-219 (5th Cir.), <u>reh'g denied</u>, 588 F.2d 829, <u>cert</u>. <u>denied</u>, 440 U.S. 981 (1978), <u>see also</u> <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974) (for sufficiency of an indictment generally); <u>United States v. Nevers</u>, 7 F.3d 59, 62-63 (5th Cir 1993) ("Indictments satisfy the second <u>Hamling</u> requirement if they describe the specific facts and circumstances surrounding the offense in question in such a manner as to inform the defendant of the particular offense charged.").  As held in these cases, an indictment must be specific enough to inform a defendant of the nature and general details of the crime that has been charged by the Grand Jury.  Nevertheless, such a charging document need only satisfy a defendant's constitutional right to know with what he is charged, but it does not have to provide the evidentiary details that will be proved to establish the commission of the offense.  <u>See</u> <u>United States v. Blinder</u>, 10 F.3d 1468, 1476 (9th Cir. 1993) (RICO indictment sufficient despite omitting material facts); <u>United States v. Chappell</u>, 6 F.3d 1095, 1099-1100 (5th Cir. 1993), <u>cert</u>. <u>denied</u>, 510 U.S. 1184 (1994) (indictment sufficient despite fact that it could have been more carefully drafted); <u>United States v. Diecidue</u>, 603 F.2d 535, 547 (5th Cir.), <u>cert</u>. <u>denied</u>, <u>Gispert v. United States</u>, 445

U.S. 946 (1980).

Judge Bazelon, in an opinion critical of the government, but yet affirming the indictment under attack, authored a relatively concise definition of the sufficiency test in United States v. Conlon, 628 F.2d 150, 155-156 (D.C. Cir. 1980). The Circuit in Conlon stated that:

> [a]n indictment is sufficient if it clearly informs the defendant of the precise offense of which he is accused so that he may prepare his defense. The test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment. In some cases, it is enough if the indictment puts the charge in the words of the statute but this is acceptable only where the statute itself fully, directly, and unambiguously sets forth all of the elements of the offense. The more generally applicable rule is that the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged.

Id. at 155. When viewed through the lens of this law, the Grand Jury's Indictment here, if anything, is significantly more detailed than required by the Constitution.

> B.    The False Statements Charged in Counts Six, Seven, and Eight, Are Sufficiently Specific.

Defendants claim that Counts Six through Eight must be dismissed by the Court because they do not set forth, presumably word for word, what was said by defendants (Count Eight) and the two witnesses (Count Six for Witness A and Count Seven for Witness B). The law does not require such specificity. In fact, the Grand Jury in this Indictment was remarkably specific regarding the statements at issue. Count Six sets forth that on or about February 16, 2005, the defendants caused Witness A to make a material and false statement

12

to the assigned AUSA.  Indictment at 3-5, 12.  In addition, the Indictment sets forth details about defendants' interaction with Witness A.  Even beyond this, the Indictment indicates that defendants caused Witness A and Witness B to "provide untruthful information . . . such that [they] . . . attributed conduct to Jerome Jones that was not accurate . . . ."  Indictment at 4.  In sum, the Indictment details how defendants caused both of the witnesses involved in Count Six and Count Seven to be untruthful and how those statements were untruthful, i.e., they attributed conduct to Jones that in reality he did not do.  The government has found no requirement from any Circuit that an Indictment must itemize the exact words that were said by a defendant to be deemed sufficient.  The test is whether the defendants can constitutionally defend themselves and whether they are sufficiently protected by the shield of the Double Jeopardy Clause.  Defendants can be certain, even absent the discovery that has been provided, with exactly what they were charged by the Grand Jury and will be facing at trial.  They can also adequately prepare for their defense, and are in no jeopardy of being charged again for this conduct.

The same is true for Counts Seven and Eight.  As noted in the facts section above, Count Seven is similar to Count Six, except that it relates to defendants' conduct in dealing with Witness B.  Count Eight is related to the statements that the detectives themselves made regarding their investigation and in dealing with these three witnesses.  Defendants repeatedly told the AUSA that the three witnesses discussed in the Indictment were indicating that Jones was not attacking Terrance Brown with a box cutter, that Jones acted alone in his assault, and that Jones was stabbing Terrance Brown, not slashing him.  They

were trying to make Jones the lone attacker and edit out the man in the black Coogi shirt from the crime.  Count Eight relates to this information that the detectives personally provided to the AUSA and other and that they knew to be false.

C.      The Conspiracies Charged in Counts One through Five Are Sufficiently Specific.

Defendants also allege that the Court must dismiss all of the other counts of the Indictment because they do not allege conspiracies.  Specificity Motion at 9-12.  This claim is not accurate.  All five of these counts allege that the two defendants conspired with each other to achieve the criminal object of the charges.  The counts also set forth in no little detain what they did.  Count One for example, charges that they did "conspire with each other" to "injure, oppress, threaten, or intimidate" Jones's civil rights under the Constitution. Indictment at 7.  Almost every fact alleged in this count, which includes the Introduction to the Indictment, shows defendants to be working together in order to provide false information to various people in order to get Jones arrested for a crime that the truthful evidence showed him not to have committed.  E.g., Indictment at 4-5.  If defendants are arguing in this portion of their Specificity Motion that the government has no evidence of defendants actually admitting to a third party or writing out the charged agreement to violate Jones's rights, this critique is accurate.  Nevertheless, the government believes that such evidence need not be alleged in a conspiracy indictment, nor need it be proved at trial. Criminal conspiracies are by their nature secret, and they are frequently and appropriately proved by circumstantial evidence, such as two defendants working in concert and in support

14

of one another.  See United States v. Gatling, 96 F.3d 1511, 1518 (D.C. Cir. 1996) ("It is well

established that an agreement sufficient to support a conspiracy conviction can be inferred

from circumstantial evidence." (citations omitted)); United States v. Thorne, 997 F.2d 1504,

1512 (D.C. Cir. 1993) ("A jury may infer the existence of an agreement through

circumstantial evidence." (citation omitted)); United States v. Treadwell, 760 F.2d 327, 333,

335 (D.C. Cir. 1985)[6] (conviction affirmed despite fact that "government's evidence against

Treadwell was almost entirely circumstantial and the majority of her actions were susceptible

to logical and innocent explanations.").  In Treadwell the Circuit even referred to the

government's case as "troubling" because it was based almost exclusively on circumstantial

evidence.  Treadwell, above, at 333.  The government does not anticipate such to be the case

here.  The evidence of defendants' agreement to engage in the conduct charged in these five

counts is extensive.  The government anticipates that the Court's jury will hear throughout

the case about defendants working together to achieve their common goal of getting Jones's

arrest warrant signed for murder one while armed and then arresting him for this crime.  One

such fact in this case is that Brown agreed to work with Morales on the Club U investigation

despite the fact that he was not assigned to it and despite the fact that he was not on her squad

within the homicide unit.  Another relevant piece of evidence is Morales calling Witness B

after Brown was instructed by MPD officials to stop his work on the investigation but before

---

[6]    Treadwell cites to and quotes Holland v. United States, 348 U.S. 121, 140 (1954),
for the axiom that "Circumstantial evidence . . . is intrinsically no different from testimonial
evidence."  Treadwell, above, at 333 n.12.

Morales was removed from the case. During that call Morales is acting for both defendants. These and other facts charged in the Indictment would certainly support a hypothetical jury verdict that defendants had an agreement to violate Jones's civil rights and to obstruct justice.

The same response applies to Counts Two through Five. Each of these counts charges that the defendants "conspired with each other" to commit their crimes. Also, as with Count One, defendants' actions regarding the three witnesses involved as well as defendants' own obstructive conduct was undertaken in concert. They acted together and in support of each other. This is what the Indictment charges and what the evidence will prove at trial. For these reasons, the government requests that the Court deny defendants' Specificity Motion.

IV.    Counts Two Through Five State Criminal Offences Under Federal Law
        (Defendants' Motion Number 2).

Counts Two through Five of the Indictment charge separate violations of Title 18, United States Code, Sections 371 (conspiracy) and 1512(c)(2) (obstruction). In their Motion to Dismiss Counts Two Through Five for Failure to State an Offense Under Title 18, United States Code, Sections 371 and 1512(c) (Defendants' Motion Number Two) (hereinafter "Obstruction Motion"), Defendants claim that these counts must be dismissed by the Court because, defendants argue that, Section 1512(c) applies only to a flavor of obstruction that relates to tampering, destruction, and presumably creation, of documents, records, or tangible objects. Obstruction Motion at 1-2. The government urges the Court to deny this motion for two reasons. First, the statute applies to a broader range of conduct than argued by defendants. Second, the obstructive conduct charged here did relate to at least one specific

16

document, that is the arrest warrant that Morales drafted, and arguably to other reports such as the witness statements and Grand Jury transcripts of Witness A, Witness B, and Witness C.

      A.    <u>Relevant Obstruction Law</u>

Read in its context with subsection (1), Title 18, United States Code, Section 1512(c)(2), with which defendants are charged, states that:

> Whoever corruptly –
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

Defendants in their Obstruction Motion rely heavily on <u>United States v. Singleton</u>, Unreported Case, 2006 WL 1984467 (S.D. Tex. July 14, 2006). <u>Singleton</u> is in all likelihood the strongest case for defendants' argument here, as it offers a restrictive holding regarding the scope of the "otherwise" clause of 1512(c)(2). <u>See</u> <u>id</u>. at 3-4. The court in that case concluded:

> that the statute[, 1512(c)(2),] proscribes a witness's intentional lies to individuals that the witness expects will report his statements to the government in connection with an official proceeding. Just as document shredding and witness tampering impair officials' ability to gather facts during an investigation or administrative proceeding, a witness's intentional provision of

> false information to be included in a written report for a
> government investigation interferes with the government's
> search for truth.

Id. at 4.  In sum, the <u>Singleton</u> court felt that for a violation of 1512(c)(2) to exist, the

obstruction involved must relate, either prospectively or retrospectively, to a document or

report.  In reaching this conclusion the court cites a number of cases for the proposition that

the document or report need not be in existence prior to the prohibited conduct.  Id. at 3 n.5.

Nevertheless, <u>Singleton</u>, in the language quoted above and elsewhere implies that a statement

that a defendant knows to be false and that otherwise meets the elements of Section

1512(c)(2) can support a conviction if the witness reasonably though that his statement would

have been reduced to an official report.  <u>See</u> <u>id</u>. at 3-5.

Other courts have reached different, and broader, conclusions regarding the scope of

conduct covered by 1512(c)(2).  In <u>United States v. Hey</u>, Unreported Case, 2005 WL

1039388 (E.D. Mich. April 29, 2005), the defendant, Robert Hay was convicted based on his

testimony in the Grand Jury.  Id. at 5.  Hay did nothing to tamper with, or create, a document

or other tangible object, with the possible exception of the transcript of his testimony, which

he presumably knew was being generated.  Hay's conduct had no conceivable nexus to a

document, report, or tangible object.  Rather, he lied, and this was found sufficient for

conviction under 1512(c)(2).  <u>United States v. Long</u>, Slip Opinion, 2007 WL 218592 (W.D.

Va. Jan. 29, 2007), is a recent decision that may be helpful to the Court as well.  In that case

the defendant, Melissa Long, was convicted of a 1512(c)(2) violation, in essence, for lying

before a grand jury.  Id. at 1, 4-5.  After itemizing the elements necessary for conviction

18

under 1512(c)(2), Chief Judge Jones wrote that a "defendant's misstatements and omissions before a grand jury coupled with the requisite mental state constitute obstruction of justice under § 1512(c)(2)." Id. at 4. There was no document, record, or tangible object, involved in Long's crimes. The conduct in United States v. Hutcherson, Unreported Case, 2006 WL 270019 (W.D. Va. Feb. 3, 2006) (decision denying motion to dismiss pretrial); and Unreported Case, 2006 WL 1875955 (July 5, 2006) (decision denying motion for judgment notwithstanding the jury's verdict after conviction), was lying to a federal agent and providing false information to a federal agent and to the federal Grand Jury, as well as other obstructive conduct. Id. 2006 WL 270019 at 1-2. In that case, the court held that:

> Section 1512(c)(2) is the omnibus clause that intends to punish the myriad of obstructive conduct that cannot be adequately defined in the statute. The defendant's conduct of lying to an FBI agent and subsequently guiding him on an expedition for nonexistent documents, is the type of conduct which Section 1512(c)(2) prohibits because the defendant intended to influence the FBI agent's actions and to obstruct and impede a criminal investigation by exhausting government resources on a meritless search. Therefore, the defendant can be convicted under Section 1512 because he corruptly intended to influence, obstruct, and impede an official proceeding.

Id. 2006 WL 1875955 at 3. Carl Hutcherson's case did involve a document: fake board meeting minutes, but the court took little note of this prong of defendant's obstructive conduct because the court had ordered this document turned over to the Grand Jury, so, under these circumstances, the court felt that it was not fair to hold Hutcherson accountable for conduct that he was required to undertake by judicial order.

    As a final legal matter, the government has found no litigation at the Circuit level that

addresses the focused issue presented to the Court here. The Second Circuit, in United States

v. Reich, 479 F.3d 179, 185-186 (2d Cir. 2007), dealt with the nexus that must be proved

between the conduct charged and its impact on the official proceeding involved, but that

case's focus is quite different than the issue presented here. Although, the Reich case did

involve a document, specifically a forged order. Id. at 182.

B.    The Conduct Alleged Against Defendants Constitutes
      Obstruction Under Title 18, United States Code, Section
      1512(c)(2).

Defendants' Obstruction Motion fails for two reasons. First, the charged subsection

of the statute contains no limitation on the obstructive conduct that falls within its definition.

It is a classic catch all provision. Second, the false information addressed by Counts Two

through Five was provided by the defendants Specifically to convince the AUSA to sign a

warrant for Jerome Jones. This warrant charged Jones with murder one while armed. This

was a crime that Jones did not commit and the detectives knew that he was not guilty of this

charge. Thus the entire point of defendants' conduct in conspiring to provide this false

information as charged in these counts was to obtain an arrest warrant that was not supported

by the true facts of the Club U matter. Thus, defendants' conduct did relate in a very direct

way to this document.

1.    The Plain Language of the Statute

The statute charged in Counts Two through Five makes it illegal when anyone

"otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so."

18 U.S.C. § 1512(c)(2). The ordinary definition of otherwise is "something or anything else

. . . something to the contrary . . . in a different way or manner . . . in different circumstances . . . ." Merriam-Webster's Collegiate Dictionary 822 (10th ed. 2001). The government has difficulty reading this statutory provision as anything but a catchall obstruction prohibition. Section 1512(c)(2) contains no limiting language other than that the obstructive conduct must occur in an official proceeding as defined in Title 18, United States Code, Section 1515(a)(1)(A). The canon's of statutory interpretation cited by defendants are not disputed by the government, but they do not apply here because the plain reading of the statute is open to only one interpretation. The government urges the Court to hold that the word otherwise that is used in the statute means just what it says. As noted above, this is what a number of other courts have done, and it is consistent with the clear language used by Congress.

      2.    The Conduct Herein Involved a Document, Report, or Tangible Object.

Even if the Court disagrees with the government's statutory analysis in the immediately preceding subsection, the facts of this case do involve obstruction that relates to documents and reports. Virtually all of the conduct charged by the Grand Jury relates to defendants' attempts to get the assigned AUSA to sign an arrest warrant for murder one while armed, a fraudulent document that defendants knew to charge a crime that Jones did not commit. This warrant was drafted by Morales, and both defendants obviously knew that the warrant existed. They were engaged in their obstructive conduct in order to get the assigned AUSA to sign it. The conduct relates Specifically to this document.

In addition to this, two other reports or documents could have been created based on

defendants' tampering with these witnesses. With the witnesses involved in Counts Two through Four, witness statements could have been prepared or the witnesses may have testified in the Grand Jury. See Hay, above, at 2, 5. Even Singleton on which defendants to some extent rely in their Obstruction Motion, holds that "the charged conduct must have some reasonable nexus to a record, document or tangible object." Singleton, above, at 3. That court goes on to reach the "conclusion that the statute proscribes a witness's intentional lies to individuals that the witness expects to report his statements to the government in connection with an official proceeding." Id. at 4. Thus, even under the restrictive analysis in Singleton, the report or document in question need not yet be created when the obstructive conduct occurs, and the possible Grand Jury testimony or a witness statement written by law enforcement would qualify, as long as the other elements are satisfied with competent and admissible evidence. Certainly these defendants more than most would know that an eye witness statement related to an ongoing and unsolved murder investigation is likely to be reduced to either writing or a transcript. In fact, as defendants know from the discovery in this matter, the witnesses did testify in the Grand Jury, although they did so truthfully, not in the way defendants had coached them.

V.     The Conspiracies Are Properly Charged in Counts Two Through Five (Defendants' Motion Number 3).

Counts Two through Five of the Indictment charge separate violations of Title 18, United States Code, Sections 371 (conspiracy) and 1512(c)(2) (obstruction), collectively conspiracy to obstruct justice. In their Motion to Dismiss Counts Two Through Five of the

Indictment for Failure to Allege an Essential Element (Defendants' Motion Number Three) (hereinafter, "Conspiracy Motion"), defendants argue that the Count must dismiss these counts because the Grand Jury's Indictment does not set forth any overt acts that occurred in furtherance of the conspiracy.  Conspiracy Motion at 2-3.  These counts do charge such acts, and the government requests that the Court deny defendants' Conspiracy Motion.

A.    Conspiracy Law

Title 18, United States Code, Section 371, the iron skillet of federal conspiracy law, legislates that:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.  . . . .

As this language and consistent caselaw make clear, an overt act in furtherance of the conspiracy must be proved to support a conviction under Section 371.  E.g., United States v. Gatling, 96 F.3d 1511, 1518 (D.C. Cir. 1996); United States v. McDade, 28 F.3d 283, 300 (3d Cir. 1994) ("an indictment under 18 U.S.C. § 371 need only allege one overt act") (citations omitted).  In addition, "[t]here is general agreement that the government is not limited in its proof at trial to those overt acts alleged in the indictment."  United States v. Adamo, 534 F.2d 31, 38 (3d Cir. 1976) (citations omitted).

B.    The Grand Jury's Indictment Charges at Least One Overt Act in Counts Two Through Five.

The government reads defendants challenge here to be that the Grand Jury's

Indictment does not use the actual language "overt act" in each of these counts. Obviously, these two words are not used in Section 371 either, and their omission is surely not fatal to these counts. Looking at Count Two, after incorporating the Introduction to the Indictment, it sets forth the date and charge and concludes that the defendants "among other things, attempted to cause, and did cause, Witness A to alter Witness A's testimony and be untruthful about the Club U matter." Indictment at 8. This is an overt act in furtherance of the charged conspiracy. Counts Three and Four charge a similar act but related to Witness B (Count Three) and Witness C (Count Four). Lastly, Count Five charges specific acts undertaken by defendants in furtherance of the conspiracy charged therein.

If the government is interpreting defendants motion correctly, its criticism is of the actual language used in the Indictment not its substance. The Indictment charges acts in furtherance of the conspiracy and puts defendants on notice regarding exactly that against which they will be preparing to defend. The government asks that the Court dismiss this motion.

VI.     Counts Two Through Five Allege "Federal" Charges (Defendants' Motion
        Number 4).

In their Motion to Dismiss Counts Two Through Five for Failure to Allege Cognizable Conspiracies to Violate Title 18, United States Code, Section 1512(c)(2) (Defendant's Motion Number Four) (hereinafter, "Federal Motion"), defendants challenge the validity of the same obstruction counts that they have challenged in the prior three motions. Here they claim that because the underlying investigation of the Club U incident, that being Terrance

Brown's murder, was a local matter that was investigated and prosecuted in a D.C. Superior Court Grand Jury and in D.C. Superior Count, that Section 1515(a)(1)(A)'s definition of "official proceeding" does not apply. Federal Motion at 1-2. Defendants' claim should fail for three reasons.

A.    The Statute

The crime charged in these four counts makes it unlawful to obstruct, influence, or impede, any "official proceeding," or attempt such. 18 U.S.C. § 1512(c)(2). The term official proceeding is defined in Title 18, United States Code, Section 1515(a)(1)(A). The relevant portion includes within that definition "a judge or court of the United States . . . or a Federal grand jury." Thus, at some level, this issue turns on the sovereign status of the District of Columbia, although as noted below, this is not dispositive. Two other statutory provisions are relevant. Title 18, United States Code, Section 1512(f)(1) indicates that the "official proceeding need not be pending or about to be instituted at the time of the offense." In addition, the law dictates that the government need not prove that the defendants knew that the proceeding that they were obstructing was a federal proceeding. See 18 U.S.C. § 1512(g)(1).

B.    D.C.'s Superior Court Grand Juries are "Federal" Grand Juries
       Under this Law.

The question presented by defendants' Federal Motion is whether D.C.'s Grand Jury is Federal and, to some small extent, whether D.C.'s Article I Superior Court houses courtrooms and judges of the United States. A few things seem beyond debate. The District

of Columbia is not a state but rather is a federal entity.  See Bolling v. Sharpe, 347 U.S. 497, 498-499 (1954); Butera v. District of Columbia, 235 F.3d 637, 646 n.7 (D.C. Cir. 2001). This unique status has its genesis in Article I, Section 8, of the Constitution.  Superior Court judges are appointed by the President and confirmed by the United States Senate.  Superior Count Grand Juries are empaneled pursuant to federal law passed by the United States Congress.  Given this, it is hard to see how the Superior Court Grand Jury can be anything but a "Federal" Grand Jury as defined by 1515(a)(1)(A).  As recognized in cases cited by defendants, D.C.'s Superior Count Grand Jury, which "may take cognizance of all matters brought before it regardless of whether a matter is returnable in the Federal or District of Columbia courts," must certainly be a "Federal grand jury," as defined in Section 1515(a)(1)(A).  D.C. Code § 11-1916(a).  The government reads Judge Gesell's decision in United States v. Allen, 729 F. Supp. 120 (D.D.C. 1989), differently than defendants on this point.[7]  Although that case did not have to reach the focused question of whether a Superior Court Grand Jury is an "official proceeding" under a law similar, although more restrictive, to that statute at issue here, the court did say that "the pending grand jury proceeding may properly be viewed as an indication that a federal 'official proceeding' was a serious

---

[7]    Hackney v. United States, 389 A.2d 1336, 1338-1339 (D.C.C.A. 1978), which is cited and referred to at some length by Allen, offers cogent logic supporting the fact that Superior Court Grand Juries are federal Grand Juries.

Defendants also cite United States v. Smith, 729 F. Supp. 1380 (D.D.C. 1990), but Smith deals with the much more limited Section 1503 of the obstruction law.  The court in Smith does not answer the question of whether a Superior Court Grand Jury is a Federal Grand Jury, although it does address the issue of D.C.'s federal/state status.  Smith, above, at 1386 n.9.

possibility." <u>Id</u>. at 122.  That is particularly true in the Court's case here.  As it became clear to others in MPD and the U.S. Attorney's Office that defendants were causing witnesses to be untruthful about what they had seen at Club U, the Grand Jury investigating the Club U matter was also investigating defendants' conduct.  A number of the Grand Jury transcripts that are central to this Court's case, and that have been provided to defendants in discovery, are from the Superior Court Grand Jury.  For example, Witness A's and Witness B's testimony in the Superior Court Grand jury, taken on March 4, 2005, and March 8, 2005, respectively, deal with both Terrance Brown's murder as well as this civil rights/obstruction matter.  It is fair to say that a good deal of the most critical Grand Jury work relevant to this case was conducted in conjunction with the investigation of the Club U matter.  Thus, even if the Court does not agree that the Superior Court Grand Jury is an "official proceeding" as a general matter, under the facts of this investigation, it certainly constituted one.

> C.    Defendants' Charged Conduct Obstructed This Official Proceeding as Well.

As an alternative, the Court, and the jury, could find that the Section 1515(a)(1)(A) official proceeding is this case.  As noted above, the statute makes clear that the official proceeding need not have been initiated at the time of the obstructive conduct.  18 U.S.C. § 1512(f)(1).  In addition, the government need not prove, or charge, that defendants knew that they were obstructing a "federal" matter when they engaged in their conduct.  18 U.S.C. § 1512(g)(1).  These two provisions serve in conjunction to sweep wide the coverage of this statute.  If for example, a defendant were to lie to local law enforcement officials or tamper

with a document in a garden variety state investigation that years later becomes part of a federal investigation and indictment, such conduct would likely fall within the scope of this broad statute. Here, the government anticipates that its evidence will demonstrate that defendants knew that they were causing multiple witnesses to change their testimony in a way that put a crime on someone who did not commit that crime. A reasonable jury could easily find this to be obstruction, and the government need not prove a mental state regarding the fact that the official proceeding was Article III "federal," nor must it prove that the official proceeding was "pending or about to be instituted," although as noted, in this case it was. 18 U.S.C. § 1512(f)(1).

    D.    <u>Conclusion</u>

In sum, the government urges the Court as an initial matter to find that a Superior Court Grand Jury is an official proceeding under Section 1515(a)(1)(A) given the District's unique status and because of the duel powers of the Superior Court Grand Juries. If it disagrees with that, this particular Superior Court Grand Jury investigation was certainly an official proceeding, as the Grand Jury was investigating defendants' conduct regarding these witnesses and their attempt to charge and potentially convict Jones on evidence that was not truthful. Lastly, this case itself, which, beyond all debate, is an official proceeding, certainly falls within the scope of the statute. The fact that the Article III District Court federal Grand Jury had not begun investigating at the time of the conduct in question is made a nonevent by statute. For these reasons, the government requests that the Court deny defendants' Federal Motion.

VII.   Counts Two Through Five of the Indictment are not Multiplicitous
       (Defendants' Motion Number 5).

In their Motion to Dismiss Counts Two Through Five of the Indictment for

Unconstitutional Multiplicity (Defendants' Motion Number 5) (hereinafter "Multiplicity

Motion"), defendants ask the Court to instruct the government to pick one of these four

counts to litigate and then requests that the others be dismissed.  Multiplicity Motion at 1.

Each of these counts charges different conduct, and there is no cause to dismiss any of them.

     A.   Multiplicity

Multiplicity is a constitutional principle that comes from the Double Jeopardy Clause

of the Fifth Amendment.  It prohibits the government from charging in multiple counts what

should be charged as a single offense.   This multiple charging potentially exposes a

defendant to being twice punished for the same crime.  United States v. Brandon, 17 F.3d

409, 422-423 (1st Cir. 1994) ("each execution of a scheme to defraud constitutes a separate

indictable offense" (citations omitted)).  It may also unfairly suggest that more than one

crime has been committed when such is not true.  United States v. Dixon, 921 F.2d 194, 196

(8th Cir. 1990); United States v. Marquardt, 786 F.2d 771, 778 (7th Cir. 1986).  Both results

are improper.  United States v. Allen, 13 F.3d 105, 107-108 (4th Cir. 1993).  A multiplicitous

indictment raises the possibility of a double jeopardy violation if the defendant is convicted

of both multiplicitous counts.  However, where each offense requires proof of different facts,

there is no multiplicity and separate punishment may be imposed in connection with each

offense.  See Blockburger v. United States, 284 U.S. 299 (1932).  The same is true where it

can be shown that Congress intended for multiple or cumulative punishment to be imposed for the same act. See Missouri v. Hunter, 459 U.S. 359 (1983).

In an area that is not completely analogous, but may be helpful, where false statements constitute the basis for multiple counts, two questions are asked to determine if the counts are multiplicitous. First, was the defendant asked the same question and did he give the same answer? If the answer to this is yes, the counts will still not be multiplicitous if the government suffered an additional harm that it did not suffer from the first false statement. See United States v. Salas-Camacho, 859 F.2d 788, 791 (9th Cir. 1988); United States v. Olsowy, 836 F.2d 439, 442-443 (9th Cir. 1988). Thus, for example, multiple counts of perjury from the same testimony on the same day will be sustained if the questions and purjurious answers are about different subjects.

      B.    Counts Two Through Five Each Require Proof of Different Facts and Are Not Multiplicitous.

Each of these four counts requires proof of very different facts. As noted above, Count Two charges that defendants caused Witness A to change Witness A's statement about what happened at Club U on February 13, 2005. Count Three relates to Witness B. Count Four relates to Witness C. Lastly, Count Five charges defendants themselves with providing false information regarding their ongoing investigation, as well as with failing to provide exculpatory information that would have shown Jerome Jones to be not guilty of murder one while armed. Defendants are correct that the statutes charged are the same in these counts, but the conduct charged is different and will be proved with different facts. To flip the

question presented, if the conduct charged in these four counts was lumped together into one count, potentially, this could be unfair to defendants, as it could well create a unanimity problem at the time of verdict. Hypothetically, a number of jurors could believe the conduct regarding Witness A (Count Two) was proved beyond a reasonable doubt while other jurors may doubt this but firmly believe the conduct regarding Witness C (Count Four) was true. Based on this combination of beliefs, the jury by committee could return a guilty verdict but yet not have been unanimous regarding the commission of one crime. This would be inappropriate and would violate defendants' jury trial rights.

It is common to have the same crime charged multiple times in one indictment when the charges are premised on different conduct. For example, a typical drug or fraud indictment may have one lead conspiracy count to be followed by multiple specific incident-based substantive underlying charges; multiple but not multiplicitous. For instance, it is not multiplicitous to charge a separate count for each day a defendant operated a "crack house," United States v. Cooper, 966 F.2d 936 (5th Cir. 1992), nor is it multiplicitous to charge two counts of possession with intent to distribute when the drugs were located in two separate locations. United States v. Blakeney, 753 F.2d 152 (D.C. Cir. 1985) (marijuana); United States v. Maldonado, 849 F.2d 522 (11th Cir. 1988)(cocaine). As noted above, convictions based on multiple false statements will also be sustained if based on different subject matter.

The government requests that the Court deny defendants' motion.

VIII.  Defendants' Motion for a Bill of Particulars Need Not be Granted
        (Defendants' Motion Number 6).

Defendant's have filed a Motion for a Bill of Particulars with the Court and, as well, have sent the government a lengthy discovery letter requesting, among many other things: the government's witness list, the transcript of the Jerome Jones trial in D.C. Superior Court, all Jencks information to be provided "in any event no later than forty-five (45) days prior to the start of trial," as well as numerous other items and documents.

A Bill of Particulars is only required when an Indictment is so vague that it is impossible for a defendant to understand with what he is charged and to avoid unfair surprise at trial. Also, the notice, or apprisal, function attributable to a Bill of Particulars may be satisfied by the government's open file discovery policy. United States v. Duncan, 598 F.2d 839, 849 (4th Cir.), cert. denied 444 U.S. 871 (1979). See also United States v. Canino, 949 F.2d 928, 949 (7th Cir. 1991) ("'open-file" policy . . . [makes] the bill of particulars unnecessary"), cert. denied 504 U.S. 910 (1992); United States v. Schembari, 484 F.2d 931, 935 (4th Cir. 1973) ("[T]he underlying objectives of a [Bill of Particulars] motion were fully satisfied by the government's voluntary disclosure of its file."); United States v. Scruggs, No. 96-00054-C, 1997 WL 128113 at *1 (W.D. Va. March 18, 1997) (quotes from Canino, supra.).

In this case the charging document is a speaking Indictment which goes into great detail as to the allegations against the defendants. The Indictment is clear as to the elements of the charges and the dates of the offenses, with the discovery providing the complete basis of the offenses charged. Defendants can fully understand the charges and will suffer no surprise regarding what constitutes the government's evidence at trial. Moreover, the

government has provided open file discovery, absent work product, in this case. The status of discovery to date is summarized in subsection II of this submission, above.

As noted in the factual subsection of this submission, the government has provided significant detail regarding the actual statements upon which it will rely at trial to prove Counts Six, Seven, and Eight. This detail is provided not only in this submission but also in the discovery materials that have been turned over. Defendants can literally match up what is set forth by the Court's Grand Jury in its Indictment with the actual transcripts of the witnesses involved.

It is hard for the government to envision a case where discovery could be more complete at an earlier time before the trial is set to begin. For this reason, and because of the detail of the speaking Indictment, the government respectfully requests that the Court deny defendants' Motion for a Bill of Particulars.

IX.    Conclusion

For these reasons, the government respectfully requests that this Court deny defendants' pretrial motions.
.

Respectfully submitted,

JOHN L. BROWNLEE
United States Attorney


s/ William F. Gould
William F. Gould
Assistant United States Attorney
District of Columbia Bar # 428468

Virginia State Bar # 67002

C E R T I F I C A T E

I certify that a true and correct copy of this government motion to inquire into the attorney status in this case has been filed through the Court's electronic filing system, which will send a copy to counsel for both defendants, **David Schertler** and **Danny Onorato** of Schertler & Onorato, L.L.P., and **John Aldock** of Goodwin Procter, for Milagros Morales, and **Reid Weingarten** and **Brian Heberlig** of Steptoe & Johnson, L.L.P., for Erick Brown, on this 11th day of May, 2007.


                                        s/ William F. Gould
                                        William F. Gould
                                        Assistant United States Attorney