UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NUMBER: |
| | : | 1:2007-cr-00075-CKK |
| | : | |
| | : | |
| | : | The Honorable Colleen |
| v. | : | Kollar-Kotelly |
| | : | |
| ERICK R. BROWN, and | : | |
| MILAGROS L. MORALES, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**UNITED STATES'S MOTIONS IN LIMINE**

The United States, by and through its attorney, the United States Attorney for the Western District of Virginia, hereby moves the Court to limit evidence, questioning, or any reference regarding the following areas.

1. The government requests that counsel refrain from referring to any biographical information about themselves in front of the jury. A few examples may put this request in context. Three of defendants' counsel have served in the Department of Justice. This service is not relevant to the Court's trial, and presumably no evidence of this prior employment will be admitted by the Court. Thus, arguments or statements asserting how defendants' counsel would have done things, or charged certain conduct, when they were with the Department should not be made. Reference to counsels' prior employment with the Department should never occur in front of the jury. In a recent trial, U.S. v. Douglas Jemal, et al., CR-05-0359,

Mr. Weingarten, in a very powerful closing argument, referring to the AUSAs, stated, "I have enormous respect for their office. I used to hold such an office." Tr. 4485, attached. In the Court's trial here, such references should be strictly prohibited because if they are allowed, it could be tantamount to counsel vouching for how defendants conducted themselves in the underlying homicide investigation. Mr. Weingarten, Mr. Schertler, and Mr. Onorato have distinguished and impressive careers, and the weight of their former positions should in no way impact the jury in this matter. In addition, incidents or personalities from counsels' past, such as that at pages 4645-4646 of the attached transcript should not be presented to the jury. All counsel should present and argue the facts of the case, not tell anecdotes or relate personal history.

 2. The government requests that the Court also prevent reference or argument about any alleged government motivation for this action. See Tr. 4485-4486. The government believes that there is no good faith basis for such accusations, and no evidence will be offered on the "ambition" or "competitive instinct" of the undersigned.

 3. The government requests that the Court require that the parties adhere to the rules regarding vouching for witnesses. The parties should not express their personal opinions that certain witnesses are liars, or were lying, and they should not indicate what they believe about credibility. In addition, counsel should not assert that opposing counsel are, or is, vouching for witnesses. Tr. 4481 ("And they[, the AUSAs,] put him on and they had him on like a puppet on a string for a day and a half giving the evidence that they vouched for. When they put that witness on, that means they are asserting to you, when they elicit

evidence the way they did from Lorusso, they're vouching for it, they're offering it to you as the truth."); 4511 (" . . . his lies were so obvious . . . ."); 4516 ("Either he was lying on the stand or he was lying to the people he was receiving the money from."); 4520 ("Every word out of Koskinen's mouth, I believed him."); 4525 (" . . . so he's not just a total liar."); 4559 (" . . . and he just walked into a monster lie.").

    4.  Lastly, the government requests that all counsel refrain from any reference to the September 15, 2005, Memorandum that has been filed under seal and <u>ex parte</u> with the Court.

    WHEREFORE, the government respectfully requests that the Court prevent testimony, argument, or any reference in the above areas.

Respectfully submitted,

JOHN L. BROWNLEE
United States Attorney


s/ William F. Gould_____
William F. Gould
Assistant United States Attorney
District of Columbia Bar # 428468
Virginia State Bar # 67002

Attachments.

## C E R T I F I C A T E

I certify that a true and correct copy of this government motion <u>in</u> <u>limine</u> has been filed through the Court's electronic filing system, which will send a copy to counsel for both defendants, David Schertler and Danny Onorato of Schertler & Onorato, L.L.P., for Milagros Morales, and Reid Weingarten and Brian Heberlig of Steptoe & Johnson, L.L.P., for Erick Brown, on this 23$^d$ day of July, 2007.

s/ William F. Gould<br>
William F. Gould<br>
Assistant United States Attorney

COPY    4402

```
            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .  Docket No. CR-05-0359
        vs.                     .
                                .  Pages 4402 to 4489
DOUGLAS JEMAL, NORMAN J.        .
JEMAL and BLAKE C. ESHERICK,    .
                                .  Washington, D.C.
        Defendants.             .  Thursday, October 19, 2006
                                .  10:10 a.m.
. . . . . . . . . . . . . . . . .

              DAY 28 - MORNING SESSION
                TRANSCRIPT OF A TRIAL
        BEFORE THE HONORABLE RICARDO M. URBINA
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      MARK H. DUBESTER, Esquire
                         TIMOTHY G. LYNCH, Esquire
                         U.S. ATTORNEY'S OFFICE
                         555 Fourth Street, NW
                         Room 5917
                         Washington, DC 20001

For Douglas Jemal:       REID H. WEINGARTEN, Esquire
                         BRIAN M. HEBERLIG, Esquire
                         ERIK L. KITCHEN, Esquire
                         STEPTOE & JOHNSON, L.L.P.
                         1330 Connecticut Avenue, NW
                         Washington, DC 20036

                         MICHELE A. ROBERTS, Esquire
                         JEFFREY M. KING, Esquire
                         AKIN GUMP STRAUSS HAUER & FELD LLP
                         1333 New Hampshire Avenue, NW
                         Washington, DC 20036

                         CHRISTOPHER B. MEAD, Esquire
                         LONDON & MEAD
                         1225 19th Street, NW
                         Suite 320
                         Washington, DC 20036

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.
```

4403

| | |
|---|---|
| For Norman D. Jemal: | STANLEY M. BRAND, Esquire |
| | ROSS A. NABATOFF, Esquire |
| | BRAND LAW GROUP |
| | 923 Fifteenth Street, NW |
| | Washington, DC 20005 |
| | |
| For Blake C. Esherick: | PAUL F. KEMP, Esquire |
| | CAROL E. BRUCE, Esquire |
| | LAWRENCE B. BERNARD, Esquire |
| | VENABLE LLP |
| | One Church Street |
| | Fifth Floor |
| | Rockville, MD 20850 |
| | |
| Court Reporter: | ELAINE A. MERCHANT, RPR, CRR |
| | Official Court Reporter |
| | 333 Constitution Avenue, NW |
| | Room 6822 |
| | Washington, DC 20001 |
| | (202)289-1571 |

1   testimony was Mr. Lynch said Douglas can't stand Lorusso being
2   around. The transcript of the testimony was he had mentioned
3   that Mr. Lorusso was getting on Douglas' nerves. Quite a
4   difference, but we'll give him the freedom of literary license.
5        What about this leap, what about this leap that that
6   meant? George Cois saying he had mentioned that Mr. Lorusso
7   was getting on Douglas' nerves means that Douglas only used
8   Lorusso for criminal purposes. Oh, my goodness.
9        What about the testimony of Lorusso? I didn't call
10  Lorusso, they called Lorusso. And they put him on and they had
11  him on like a puppet on a string for a day and a half giving
12  the evidence that they vouched for. When they put that witness
13  on, that means they are asserting to you, when they elicit
14  evidence the way they did from Lorusso, they're vouching for
15  it, they're offering it to you as truth.
16       But when Lorusso describes his relationship with
17  Douglas and it's inconsistent with their theory, oh, my God,
18  they shed it. Not convenient.
19       I'll get right to the punch line.
20       Lorusso is a complicated guy. There were two Mike
21  Lorusso's. He fooled a lot of people. But there was nothing
22  complicated about his feelings in his relationship with
23  Douglas. He lionized Douglas, he idolized Douglas, he admired
24  Douglas, he wanted to be as close to Douglas as he could
25  possibly be. He wanted inside Douglas about a billion times

1  property the District of Columbia leased.
2      Well, one of the little pieces we wanted to clear up
3  was the surveyor. We wanted you to know what the District of
4  Columbia actually leased.
5      And it's important because we know that after Lorusso
6  got back from Vegas and there was actually a letter of intent
7  signed, that the amount of the premises moved from 225,000 feet
8  to 363,000 feet. And what the surveyor established is that
9  second number had to encompass both the red and the green.
10      So you have two possibilities. When the Government
11  introduced evidence and implied to you that the work on the
12  green had nothing to do with the District of Columbia, either
13  they were misleading you or they were mistaken, and I'm not
14  sure which is worse.
15      So, obviously, I'm worked up about this. And I'm not
16  going to mince words, because the issues before you are too
17  important. But this is an important part of the closing. I
18  take no pleasure in this part of the task.
19      They are, obviously, enormously gifted prosecutors,
20  they're prodigious workers, and I like them, they're good
21  people. That's just true. I have enormous respect for their
22  office. I used to hold such an office. And we will never ever
23  ever say acquit us because the Government made mistakes or
24  misbehaved.
25      Any defense attorney whoever gets up before you when

1  you're serving on a jury and makes that argument, you turn your
2  back on that argument. That's not what's going on here.
3      What is going on is we believe misimpression after
4  misimpression after misimpression has been left with you.
5  We're after the truth.
6      How could it be that this happened?
7      I'll tell you a story.
8      Someone lived in a dark gloomy house and the windows
9  were never washed, they were smudged up, all kinds of junk on
10 the windows. Someone went up to that person and said, what's
11 the weather out like today? And the guy living in the house
12 looked through the window and said, nasty. Had he opened the
13 window he would have seen the sun was shining.
14     Do you get my point? These are prosecutors. They
15 can get very cynical in this job. They're also human. They
16 can make mistakes. They are inflicted by all the things we're
17 all inflicted by, by ambition, by competitive instinct. And it
18 is also true in a huge case when the United States expends
19 resources, there's tremendous pressure to win. Sometimes
20 prosecutors can try too hard to win.
21     Be that as it may you get the point. They're not
22 always right, they're human.
23     I don't believe they stood up at any particular point
24 in time and deliberately, willfully tried mislead you. But we
25 believe they never got Douglas and they never got Douglas

of, and then seeking a life ring, he came up with a Douglas Development story that the government loved.

And consistent with that effort to hide Lorusso -- and as we know, there's no hiding Lorusso, in closing argument they sort of -- let's start with the taxes, move to MTD, and only deal with Lorusso towards the end. But again, he was on the stand, as I recall, over a week. You got full force of Lorusso. And let's see where it shakes out.

On direct, Lorusso obviously was carefully scripted and, objectively speaking, he answered the questions intelligently, he told a joke or two, he was extremely disciplined. And that was the Lorusso on direct.

On cross-examination, his lies were so obvious, his explanations for so many things so preposterous, that he appeared a different person. I take no professional pride in it; Emma, my chocolate lab, could have made him look ridiculous with some of his answers.

It began with his resume. His resume, Defense Exhibit 1100. Why don't we just put it up very, very briefly. Taken at face value, it is extremely impressive. If you read what's on his resume, he appears to be a seriously smart guy and an expert in real estate.

Of course he admitted to fabrication after fabrication after fabrication on his resume when pressed. Even if you pulled -- the amazing thing about Lorusso, if you pulled out the

1  his friends.

2      And then he said that he had no idea what these people were

3  investing in.  I mean, it was almost staggering that a witness

4  proffered by the government takes the stand and testifies to

5  that effect, that he solicited money from these people, and had

6  no idea what he was soliciting the money for.

7      Either he was lying on the stand or he was lying to the

8  people he was receiving the money from.  I mean, can you imagine

9  that when he spoke with Mrs. Zagarella, or any of his friends,

10 and they were investing money, that he could have actually said

11 I don't have any idea what this investment is?  I mean, it was

12 just unbelievable.

13     And then we probed his banking practices.  He admitted to

14 structuring money, taking chunks of cash, and going bank to bank

15 to bank to deposit them so as to avoid federal reporting

16 requirements.  That's a felony.  He talked about these accounts

17 he had, the ROI accounts, and in the midst of his

18 cross-examination, he told us about a Swiss account, a third ROI

19 account that was a surprise.  And then he talked about his

20 testimony before the SEC.

21     And it was just one line after another that he gave to

22 federal authorities, the SEC, and the second time he testified,

23 just right down the street, within the jurisdiction of these

24 prosecutors.  It was just -- and he admitted on the stand that

25 the evidence he offered to the SEC was, quote, inaccurate.

1     The ultimate answer to this question is indeed there were
2  two Mike Lorussos in the D.C. government. There's no reason in
3  the world and there's no evidence before this trial to think
4  that the mayor saw a crook when he saw Mike Lorusso patrolling
5  the halls. Koskinen obviously had a lot of contact with
6  Lorusso. And I'm sure I'm shoulder to shoulder with the
7  prosecutors on this, Koskinen is a great guy. Every word out of
8  Koskinen's mouth, I believed him. There's no reason to think,
9  there's no evidence in this case that there's anything but
10 truthful testimony from Koskinen.
11    He talked about his girlfriend. He gave his girlfriend
12 dirty furniture -- dirty meaning he used his D.C. credit card.
13 There is no evidence in this courtroom and nothing to contradict
14 Lorusso that his girlfriend had no idea that Lorusso was up to
15 no good on the side. He dealt with city agencies all the time.
16 There was no evidence offered by the government that when he
17 dealt with city agencies, his clients at the city agencies had a
18 clue that there was any problem with Lorusso.
19    I mentioned Ken Kauffman. You saw e-mail after e-mail from
20 lawyers who were working with Office of Property Management.
21 They were involved in these deals. And of course the prosecutor
22 says, well, they weren't involved in the economics. Economics
23 or not, they were involved in the deals. Lorusso was dealing
24 with city lawyers all the time.
25    There's no evidence in this record that any of those people

1  D.C. money, so concerned about protecting the treasury of the
2  District of Columbia, as they should be, aren't so interested in
3  getting to the bottom of conduct that is at the very, very, very
4  least, extraordinarily questionable.
5     And you have to ask yourself why. I think the answer leaps
6  out of the question. This is the ostrich situation. You stick
7  your head in the sand, you don't see anything. They don't want
8  any more problems with Lorusso. They don't want to know any
9  more wrongdoing by Lorusso. He's impeachable enough. They're
10  hanging on to his credibility so that he can convict these guys.
11     But when you scratch the surface and you say hello, you
12  have a situation with Roberson, a mover, that is exactly
13  parallel to the situation with Corboy and Gillis, hundreds of
14  thousands of dollars leaving the treasury, you have credit card
15  charges that make no sense, and you have Lorusso saying he's
16  generating cash and receiving cash from Roberson, don't you at
17  least make inquiry, or are you too busy trying to establish that
18  sprinkler damage?
19     Koskinen I touched upon. Great public citizen, totally
20  truthful. He was asked a lot of "had I known" questions, and
21  his answers were what you would expect from someone of his
22  stature. Had I known, I would have made inquiry. I would need
23  to know the facts. Yes, it's true that a relevant fact even for
24  a city manager is whether or not there was a personal
25  relationship, a friendship between the donor and the donee.

        And he also said that a conflict does not automatically mean harm to the city. And he also said, and I think it's extremely important, that not every appearance violation, not every personnel violation constitutes a federal crime.

        We saw Reverend Payne. And Reverend Payne is Branlik. And the ostensible reason for calling Reverend Payne to the stand was to support Lorusso's credibility. Goes back to the Saturday in Disneyland, or DisneyWorld, I forget which one is which. And what Payne said is that -- and Payne is Branlik.

        What Payne said is that he was at the District building where they moved out of the following Friday. So the government was only six days off when they were trying to corroborate Lorusso's credibility.

        Now, think about this. Of all the impeachment of Lorusso, this is who they choose to come in to bolster Lorusso. And this of course is to put Lorusso at the site at some time, so he's not just a total liar. Of course they're six days off, and I think it's obvious --

            MR. DUBESTER: Objection.

            THE COURT: Rephrase.

            MR. WEINGARTEN: Based upon your observations in this courtroom, you will conclude why they put Branlik on and what point they were trying to make.

        Villegas. Hard not to feel sorry for him. Obviously corrupted by Lorusso. And the conclusion you can come to, after

1    said, quote --

2         And Mr. Lynch said, well, if you got $10,000 and you

3    had cash and you're going to New York and you got this money,

4    why did you withdraw the money from your ATM? And he said,

5    quote, I believe I hadn't gotten the cash yet from Blake.

6         Bingo. Nailed in a big lie. That was a monster lie.

7    You know before they put him on the stand to talk about cash

8    from the defendants, they had to vet him, they had to prepare

9    him, they had to get him ready, and he just walked into a

10   monster lie. And the reason for that is there was no time for

11   him to do it.

12        He testified clearly, and this is 3143, that he got

13   the alleged cash from Blake in advance of the trip from the

14   humidor on a business day. Saturday, August 4 is when he

15   withdrew the cash. So he could not have been telling the truth

16   when he said, I believe I hadn't gotten the cash yet from

17   Blake.

18        Big, big monster lie. Just on that basis alone you

19   can toss out anything this man says that incriminates the

20   defendants.

21        But he's nimble. I mean, he realized he was caught

22   cold, so he danced. And then said, well, maybe, maybe, maybe I

23   got the cash from Blake after I got back from New York. And

24   the problem with that is Mr. Kemp proved that Blake was in

25   South Carolina after Lorusso got back from his trip to New

1  of the government is we were going broke, we had to corrupt the
2  guy to survive, and that's what we did. And that's the
3  centerpiece of their charges.
4      Lorusso's gone in 2003. And I have two words to say in
5  response to the government's charge. Carol Mitten. I told you
6  yesterday she's a very, very important witness. She is now the
7  head of OPM. She was called to testify in this case. She was
8  called to bring in documents, and she did bring in documents,
9  and she evidenced a complete familiarity with the documents and
10 she runs OPM today. Obviously knowing full well the charges in
11 this case which include ripping off the District of Columbia.
12     And what's the headline? The headline, knowing the charges
13 and knowing the evidence as she does, the District of Columbia
14 continues to do business with Douglas Development, likes doing
15 business with Douglas Development, and wants to do more business
16 with Douglas Development.
17     Last, I want to share with you a story I once heard from a
18 teacher. It's funny where you get wisdom, it stays with you. A
19 teacher I had many, many years ago told us the story about when
20 she lived in the old country there was a time of danger, where
21 she was at great personal peril, and a total stranger came out
22 of the blue and saved her life. And she came to the States,
23 grew up, never had an opportunity to thank this individual or
24 ever speak to this individual again.
25     And she developed a philosophy, and the philosophy goes

1   like this: You live on this earth, we wake up, we work, we
2   raise a family, we eat, and go to the bathroom, we do all the
3   things that we normally do, and then for virtually everybody,
4   you get called to do something extraordinary. You get called to
5   get off the beaten track and perform a task that has profound
6   implications.
7      And since I've become a lawyer, I always believed her story
8   applies to jury duty. Because after all, you're going to go
9   back in that jury room next week and you're going to deliberate
10  this case and you're going to deliver a verdict that has
11  profound implications for three people. I have no doubt, and
12  I'm sure the prosecutors have no doubt, that you'll do it with
13  the same courage that the individual in the old country had when
14  he saved my former teacher.
15     You'll do it with wisdom, you'll do it with fairness.
16  You'll do it consistent with the Judge's instructions. I
17  respectfully believe when you do this you will reject the
18  distorted picture of Douglas Jemal and Douglas Development that
19  has been presented to you from day one by the prosecutors, and
20  that when you judge Douglas, you won't judge him for being a
21  developer or a visionary or a guy who builds great buildings.
22  You'll judge him as a man based on the evidence, and the
23  conclusion you'll come to is that he is not guilty of the crimes
24  charged. Thank you.
25     THE COURT: Thank you, Mr. Weingarten.