## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| v. | )  Criminal Case No. 07-075 |
|  | ) |
| ERICK R. BROWN, and | )  Judge Colleen Kollar-Kotelly |
| MILAGROS L. MORALES, | ) |
|  | ) |
| Defendants. | ) |

### DEFENDANTS' MOTION IN LIMINE TO USE STATEMENTS OF
### THE DEPARTMENT OF JUSTICE AS STATEMENTS OF A PARTY-OPPONENT

Defendants, Milagros L. Morales and Erick R. Brown, through undersigned counsel, move this Court, in limine, to permit them to use certain factual assertions made by the Department of Justice as statements of a party-opponent. The reasons supporting this motion are set forth below.

## I.    FACTUAL BACKGROUND

Defendants Erick Brown and Milagros L. Morales, both detectives with the Metropolitan Police Department in the District of Columbia, were charged in an eight-count indictment with:

(1) one count of a conspiracy against civil rights in violation of 18 U.S.C. §241,

(2) four counts of conspiracy to obstruct justice in violation of 18 U.S.C. §§371 and 1512( c)(2),

(3) three counts of false statements in violation of 18 U.S.C. §1001.

In an Order dated July 9, 2007, this Court dismissed the four counts of conspiracy to obstruct justice. On July 18, 2007, the grand jury issued a superceding indictment adding charges of violating the District of Columbia obstruction of justice statute.

As the Court is now well aware, the charges in the indictment arise out of the interaction

between Detectives Brown and Morales and three witnesses while the Detectives were investigating a murder that occurred in Northwest section of the District of Columbia on February 13, 2005.  The Government alleges that Detectives Brown and Morales instructed witnesses to provide false information to the prosecuting attorney in order to obtain an arrest warrant for the target of the investigation, Jerome Jones.  Detectives Brown and Morales strongly disagree with that allegation.

Jerome Jones, the person who was the target of the arrest warrant prepared by Detectives Brown and Morales, was eventually arrested.   In January of this year, he was tried on charges of assault with intent to kill Terrance Brown in January of this year in the District of Columbia Superior Court.   In connection with the criminal prosecution of Mr. Jones, the Department of Justice[1] filed two pleadings, in particular, in which it addressed the conduct of Detectives Brown and Morales.  First, out of an apparent concern that in the trial of Jerome Jones, counsel for Mr. Jones would attempt to use these allegations against Detectives Morales and Brown against the Government, the Department of Justice, through the U.S. Attorney's Office for the District of Columbia, filed a motion entitled:  "***Government's in Limine Motion to Preclude Mention of Conduct of Detectives Millagros [sic] Morales and Erick Brown***."  Second, in response to a defense motion to dismiss, the Department of Justice filed ***"Government's Opposition to Defendant's Motion to Dismiss Indictment.***"  Both pleadings are attached hereto as Exhibits 1 and 2, respectively.

In both pleadings, the Department of Justice made several statements that undermine its current prosecution of the two Detectives.  As we set forth below, those statements made by the

---

[1] Throughout this motion, we will use the term Department of Justice to refer to the Government or more specifically, the United States Department of Justice, which was responsible for the prosecution of Jerome Jones in the District of Columbia Superior Court as well as the present prosecution of Detectives Brown and Morales.

same governmental entity that is currently prosecuting Detectives Brown and Morales qualify as statements of a party-opponent and are thus admissible as admissions by the Department of Justice. For that reason, we ask that the Court allow the defense to introduce the statements of the Department of Justice in its Superior Court pleadings.

## II.     LEGAL ANALYSIS

### A.     THE RELEVANT STATEMENTS.

In its "***Government's in Limine Motion to Preclude Mention of Conduct of Detectives Millagros [sic] Morales and Erick Brown,***" (a copy of which is attached as Exhibit 1 and which is referred heretofore as "the Government's Motion"), the Department of Justice stated:

> The United States of America, by and through its attorney, the United States for the District of Columbia, respectfully submits this in limine motion to preclude mention of the conduct of Detective Millagros Morales and Erick Brown, which can only be inflammatory. The defense likely will seek to us the conduct of the two detectives to argue that the jury should not believe the trial testimony of the three eyewitnesses. This argument is not supported by the facts and would be more prejudicial than probative, and likely to cause confusion for the jury.

(The Government's Motion at p.1.) The Government's Motion then goes on to assert:

> The United States expects the defense to raise the issue that the two detectives initially assigned to the case interfered with three of the eyewitnesses to such an extent that the trial testimony of these witnesses can not be credited. ***This assertion is not only false but permitting the defense to argue this will be a distraction to the jury. . . [U]ltimately, their actions did not interfere with the truthful testimony of the witnesses.***

(The Government's Motion at p. 2.) Later the Government argues;

> ***Here, the evidence of the conduct of Detectives Brown and Morales is not relevant.*** While the three witnesses did temporarily change their testimony, within a short time period each witness reaffirmed (and swore to under oath in the grand jury) the testimony they had initially told the detectives either on video (for two of the witnesses) or in person (for one).

(The Government's Motion at p. 7.)

The Government also makes several other factual assertions:

> *Indeed, each of the witnesses stated that they did not think anything was wrong when the detectives asked them to change their testimony.*

(The Government's Motion at p. 8, n. 6.)

> *From the very beginning, all three of these witnesses stated that they saw the defendant in a fight with the decedent, and two out of the three saw him swinging at the decedent with a box cutter. There was never any question as to whether the defendant was involved in the attack.*

(The Government's Motion at p. 8.)

In it's second pleading, (a copy of which is attached as Exhibit 2 and which is referred heretofore as "the Government's Opposition"), referred to as the Government's Opposition, the Government claimed:

> On or about February 13, 2005, at approximately 2:45 a.m., the defendant, Jerome Jones, got into a fight at the Club U nightclub formerly located in the Reeves building at 14th and U Streets, NW, Washington, D.C. After arguing with the decedent in this case, Terrance Brown, on the dance floor, *he stabbed him multiple times with a short-bladed instrument* described by witnesses as a box cutter. One other individual involved in the fight also had a knife. This man has been described by witnesses as wearing a black Coogi brand shirt.

(Government's Opposition at 1.) Ironically, in this case, the Department of Justice is prosecuting Detectives Brown and Morales, in part, for using the term "stabbing" in support of their arrest warrant for Jerome Jones, claiming that the use of that term was not supported by the evidence. Yet the same Department of Justice, in its prosecution of Jerome Jones used precisely the same term to describe the actions of Jerome Jones. Moreover, the Department of Justice goes further and describes the weapon as a "*short-bladed instrument*." In the present prosecution, the Department of Justice is accusing the two Detectives of making false statements in describing the weapon used by Jerome Jones as a silver object with a sharp blade. Clearly the unequivocal factual assertions of the Department of Justice undermine its claim in this case that

the Detectives acted improperly.

Later in the same pleading, the Department of Justice asserts:

On February 14, 2005, the detectives interviewed W-3 on videotape and she described what she saw of the fight.  She knew the defendant as Jerome. . . She was approximately 6-7 feet from the defendant when he pulled out *a knife* and began throwing punches at the decedent with it. . . . W-3 positively identified the defendant as the person *who stabbed the decedent*.

(Government's Opposition at 3.)

Finally, in the same pleading, the Department of Justice noted:

[Detectives Brown and Morales] did not invent the defendant's role as he suggests. . .  From the very beginning, all three of these witnesses stated that they saw the defendant in a fight with the decedent, and two out of the three saw him swinging at the decedent with a box cutter.  There was never any question as to whether the defendant was involved in the attack.

(Government's Opposition at 5.)

## B.    THE RELEVANT LAW

Rule 801(d)(2) states that out-of-court statements offered are admissible if:

The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Party admissions differ from most out-of-court statements in that their admissibility does not require the demonstration of "guarantee[s] of trustworthiness" but is based rather upon the identity of the speaker.  Fed. R. Evid. 801 advisory committee's note.   "Party admissions doe not require foundations to be admissible as substantive evidence; they need not have been made on personal knowledge and may be in opinion form."  *In re M.D.*, 758 A.2d 27, 32 (D.C. 2000). So long as the statement is fairly attributable to the party, "it makes no difference whether the

adopting party had any knowledge of the truth of the matters mentioned in the statement."  5

Weinstein's Federal Evidence § 801.31 [3][b](2003); *accord*, 2 McCormick on Evidence § 255,

at 139-40 (5th ed. 1999); 4 Wigmore, Evidence § 1053(1); at 16(Chadbourn rev. 1972).

"[T]he Federal rules clearly contemplate that the federal government is a party-opponent

in criminal cases."  *United States v. Morgan*, 581 F.2d 933, 937 n. 10 (D.C. Cir. 1978).

"Whether or not the entire federal government in all its capacities should be deemed a party-

opponent in criminal cases . . ., the Justice Department certainly should be considered such."

*United States v. Kattar*, 840 F.2d 118 , 130 (1st Cir. 1988).  In *Kattar*, the First Circuit ruled that

it was error by the trial court to exclude the admission of statements made by the government in

briefs it had filed before trial.

> [T]he statements here were admissible under Rule 801(d)(2)(B) as statements of
> which the party-opponent "has manifested an adoption or belief in its truth."  The
> Justice Department here has, as clearly as possible, manifested its belief in the
> substance of the contested documents; it has submitted them to other federal
> courts to show the truth of the matter contained therein.  We agree with Justice
> (then Judge) Stevens that the assertions made by the government in a formal
> prosecution . . . "establish the position of the United States and not merely the
> views of its agents who participate therein."

*Id*. at 131 (*quoting United States v. Powers*, 467 F.2d 1089, 1097 n. 1 (7th Cir. 1972)(Stevens, J.,

dissenting).   The Fourth Circuit has indicated that clear and unambiguous statements made by a

party in a civil or criminal case should be admissible under Rule 801(d)(2), In *United States v.*

*Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986), the Court held that statements by a government

attorney during *voir dire* would have been binding against the government if they had constituted

a clear and unambiguous admission.  "[A] clear and unambiguous admission of fact made by a

party's attorney in opening statement in a civil or criminal case is binding upon the party."  *Id*.

The statements made by the Department of Justice attorneys in the prosecution of Jerome

Jones qualify as admissible evidence under Rule 802(d)(2).  The United States is "bound by the

position taken in a formal prosecution . . . [and] cannot escape a view taken in a separate prosecution on the ground that one prosecution simply represents the view of its agents who participate in that particular prosecution." *United States v. Kattar*, 840 F.2d 118, 130 (1st Cir. 1988). In *United States v. Salerno*, 937 F.2d 797 (2d Cir. 1991), the Second Circuit held that the trial court abused its discretion in refusing to admit a prosecutor's jury arguments from an earlier trial that involved the same factual issues. In doing so, the court ruled there was no *per se* prohibition on the use of prior opening statements in criminal trials, stating:

> To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the trier of fact.

*Id*. at 811 (*quoting United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984)).

The case for admission of a prosecutor's prior statements is even more compelling for obvious reasons.

> This inconsistency is troubling where it source is the prosecutorial arm of the federal government. It is one thing for private counsel to characterize events in contrasting ways in two separate litigations, because the counsel there is required under our adversary system to defend its clients in the most vigorous fair manner possible – counsel is expected to put the best possible gloss on a client's case. The function of the United States Attorney's Office, however, is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial. If it happens that the government's original perspective on the events is proven inaccurate, such revelation is in the government's interest as well as the defendant's. The criminal trial should be viewed not as an adversarial sporting contest, but as a quest for truth.

*United States v. Kattar*, *supra*, 840 F.2d at 127.

The Department of Justice prosecutors made a number of statements during the course of the trial of Mr. Jones that are exculpatory toward Detectives Brown and Morales. For these

reasons, the statements of the prosecutors in their prosecution of Mr. Jones should be admitted as statements of a party-opponent in the trial of Detectives Brown and Morales.  .

Finally, we recognize that the Court must also examine whether any statements should be barred based on FRE 401[2] or 403[3] requirements.  Since the statements made by the prosecutors at the trial of Mr. Jones relate to the same transactions at issue in this case, and in many respects exculpate Detectives Brown and Morales or support the Detectives' theory of the case, the statements are clearly relevant.  The Court must next determine if the statements, though relevant, are prejudicial, confusing, or a waste of the Court's time.  They are not.

The statements made by the prosecutors in pleadings against Mr. Jones are not prejudicial because it is settled law that a party's clear and unambiguous statement of fact is binding upon that party. *See United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986); *United States v. McKeon*, 738 F.2d 26, 30 (2nd Cir. 1984).   Furthermore, there is no risk of substantial time being wasted or confusion by admitting the government's prior statements in Mr. Jones prosecution. The topics, testimony, and witnesses in the trial of Mr. Jones are an integral part of the trial of Detectives Brown and Morales.  Logistically, it will be easy to admit the statements of the government prosecutors as relevant portions of their pleadings.  It will take a minimal amount of the time and the import of the statements will be clear to the fact-finder.

## III.   **CONCLUSION**

For the reasons set forth above, we ask the this Court rule in limine that the Defendants may introduce into evidence the statements of the Department of Justice as set forth above as

---

[2] FRE Rule 401 states: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

[3] FRE Rule 403 states: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

statements of a party-opponent.

Dated:  July 25, 2007                    Respectfully submitted,

                                        MILAGRO A. MORALES

                                        By Her Attorneys,


                                        _____/s/_____
                                        David Schertler
                                        Danny Onorato
                                        SCHERTLER & ONORATO, LLP
                                        601 Pennsylvania Avenue, N.W.
                                        Suite 900 – NORTH Building
                                        Washington, D.C.  20004
                                        Telephone:  (202) 628-4199
                                        Facsimile:  (202) 628-4177


                                        ERICK R. BROWN

                                        By his attorneys,


                                        _____/s/_____
                                        Brian Heberlig
                                        Reid H. Weingarten
                                        STEPTOE & JOHNSON, LLP
                                        1330 Connecticut Avenue, NW
                                        Washington, DC  20036
                                        Telephone:  (202) 429-8134
                                        Facsimile:   (202) 429-3902

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion was delivered by email service list and first class mail, postage pre-paid, this 25th day of July 2007 to:

William F. Gould, Esq.
Assistant United States Attorney
Western District of Virginia
2100 Jamieson Avenue
Alexandria, VA  22314
Fax:  703-299-3981


      /s/
David Schertler

# EXHIBIT 1



SUPERIOR COURT OF THE
DISTRICT OF COLUMBIA – FELONY BRANCH

UNITED STATES OF AMERICA     :    Criminal Case No. 2005FEL006847

vs.      **FILED**     :    Judge Herbert B. Dixon, Jr.

JEROME JONES            :    Trial date: January 3, 2007

## GOVERNMENT'S IN LIMINE MOTION TO PRECLUDE MENTION OF CONDUCT OF <u>DETECTIVES MILLAGROS MORALES AND ERICK BROWN</u>

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this *in limine* motion to preclude mention of the

conduct of Detectives Millagros Morales and Erick Brown, which can only be inflammatory.

The defense likely will seek to use the conduct of the two detectives to argue that the jury should

not believe the trial testimony of the three eyewitnesses. This argument is not supported by the

facts and would be more prejudicial than probative, and likely to cause confusion for the jury. In

support of this motion, the government relies upon the following points and authorities and any

other points and authorities that may be cited at a hearing on this motion.

### I. BACKGROUND

1.     The government expects its evidence to show as follows. On or about February

13, 2005, at approximately 2:45 a.m., the defendant, Jerome Jones, got into a fight at the Club U

nightclub formerly located in the Reeves building at 14th and U Streets, NW, Washington, D.C.

After arguing with the decedent in this case, Terrence Brown, on the dance floor, the defendant

slashed at him multiple times with a short-bladed instrument described by witnesses as a box

cutter. One other individual involved in the fight also had a knife. This man has been described

by witnesses as wearing a black Coogi brand shirt. Security personnel broke up the fight by

carrying the defendant and the decedent out separate entrances. They brought the decedent out



near the Industrial Bank entrance in the Reeves building lobby where he died from his wounds.

2.    The defendant was subsequently charged with Assault with Intent to Kill While Armed (box cutter), Possession of a Prohibited Weapon (box cutter) and Obstruction of Justice. The defendant has not been charged with the murder of the decedent.[1] The second stabber, the man in the black Coogi shirt, has yet to be charged. The defendant's trial is set for January 3, 2007.

3.    The United States expects the defense to raise the issue that the two detectives initially assigned to the case interfered with three of the eyewitnesses to such an extent that the trial testimony of these witnesses can not be credited. This assertion is not only false but permitting the defense to argue this will be a distraction to the jury. The United States agrees that the actions of the detectives were inexcusable, wrong and possibly even criminal.[2] However, ultimately, their actions did not interfere with the truthful testimony of the witnesses. Indeed, two of the three witnesses were videotaped by the detectives before the detectives' motive for influencing the witnesses to change their testimony (upon information and belief, to have the U.S. Attorney's Office sign the arrest warrant for the defendant as soon as possible) even arose. In other words, for two of the three witnesses, there is tangible evidence in the form of videotapes that the witnesses were not tainted, since their Grand Jury testimony matches those initial interviews and the detectives' interference comes between the two. For the third witness,

---

[1] According to the medical examiner, the fatal knife wound to the heart was administered by a knife with at least a three inch blade, not a box cutter.

[2] Indeed, an investigation of the detectives' actions in this case is being conducted by the United States's Attorney's Office for the Western District of Virginia. The United States Attorney's Office for the District of Columbia has recused itself from this investigation.

2

although her initial interview was not taped, she too, testified in the Grand Jury consistently with

her initial interview and despite the detectives' actions.

**The Initial Investigation**

4.      On February 13, 2005, the lead detectives in the case at the time, Detective Erick

Brown and Detective Milagros ("Millie") Morales, showed W-1[3] a photo array including the

defendant. W-1 positively identified the defendant. On February 14, 2005, the detectives

interviewed W-1 on videotape and she described what she saw of the fight. She was in the

immediate vicinity with the decedent when the fight broke out. She did not see either the

defendant or the decedent with a weapon. She knew the defendant as "Gerald" from previous

occasions at the club. Prior to the fight, she had seen Gerald at the bar with the black Coogi-

shirted man and provided a detailed physical description of both men.

5.      On February 14, 2005, the detectives also interviewed W-3 on videotape and she

described what she saw of the fight. She knew the defendant as "Jerome" through W-2

(discussed below) from previous occasions at the club. She was approximately 6-7 feet from the

defendant when he pulled out a box cutter and began throwing punches and slashing at the

decedent with it. She provided a detailed physical description of both the defendant and the

black Coogi-shirted man. That same day, Detectives Brown and Morales showed W-3 the same

photo array including the defendant. W-3 positively identified the defendant as the person who

stabbed the decedent.

6.      On February 15, 2005, armed with this evidence, the detectives requested

---

[3] Witnesses will be referred to in the same manner as in the arrest warrant ultimately
signed by the United States.

3

Assistant United States Attorney (AUSA) Jennifer Anderson's[4] signature on an arrest warrant for

the defendant. After reviewing the affidavit in support of the arrest warrant and the case file,

AUSA Anderson refused to sign the warrant and raised a number of issues with the warrant. The

detectives were unhappy with AUSA Anderson's decision and pressured her to sign the warrant,

claiming that they had probable cause to arrest the defendant for the murder of the decedent.

AUSA Anderson refused to do so and demanded more evidence from the detectives and also

requested to speak to certain witnesses herself.

7.    Later that same day – after showing her the photo array –  the detectives again

spoke with W-1 and told her to adjust her testimony in the following way: to describe the black

Coogi-shirted man as punching the decedent with both hands, rather than as making a punching

motion to the torso with his left while pulling the decedent down and forward with his right.

Meeting with AUSA Anderson that same day, February 14, W-1 initially described the black

Coogi-shirted man as punching the decedent with both hands.

8.    On February 16, 2005 – after showing her the photo array –  the detectives also

spoke with W-3 and told her to adjust her testimony in the following way: 1) to describe the

defendant's weapon as a shiny object rather than a box cutter; 2) to state that the defendant had

made stabbing rather than slicing motions; and 3) to state that she was unsure if other people

jumped into the fight, when she had seen others jump in.

9.    On February 17, 2005, W-3 reported events to AUSA Anderson as suggested to

her by the detectives. When AUSA Anderson confronted W-3 with her videotaped statement,

_____

[4] Ms. Anderson is now a Superior Court Associate Judge but at the time was a Deputy
Chief in the Homicide Section.

4

W-3 then told AUSA Anderson that she made those changes because the detectives told her to.

10.     On February 17, 2005, the detectives, at the request of AUSA Anderson,
interviewed W-2 – not on videotape – and she described what she saw of the fight. She stated
that she was 2-4 feet away from the defendant when he pulled out a box cutter and used it against
the decedent. She knew the defendant as "Jerome" from previous occasions at the club. W-2
also reported that the day after the incident the defendant called her on the phone and admitted
that he "stabbed the motherfucker." On February 17, 2005, the detectives spoke with the witness
and told her to adjust her testimony by describing the defendant's weapon as a "shiny, metal
object". That same day, W-2 initially told AUSA Anderson that the defendant had used a shiny,
metal object, but – during the same interview – admitted she had changed this detail at the
request of Detectives Brown and Morales. On February 18, 2005, Detectives Brown and Morales
showed W-2 the same photo array including the defendant. W-2 positively identified the
defendant.

11.     Confronted now with two witnesses who were changing their testimony at the
request of the detectives, AUSA Anderson reported both detectives to their superiors. Both were
removed from the investigation.[5]

**Grand Jury Testimony Unaffected by Detectives' Conduct**

12.     In the case of all three witnesses, the interference by the detectives was exposed
before she testified in the Grand Jury, however. On March 4, 2005, W-1 testified before a Grand
Jury consistently with her videotaped statement. W-1 explained Detectives Brown and Morales'

---

[5] The two detectives assigned to the case now, Dean Combee and Kim Lawrence, were
not involved in any of the witness tampering in this case.

attempts to shape her testimony and why she first did as they suggested. The government has provided a redacted copy of this witness' Grand Jury testimony detailing these events to the defense.

13.     The interference by the detectives was exposed before W-2 testified before the Grand Jury. On February 18, 2005, W-2 testified before the Grand Jury consistent with her original statement. The government has provided a redacted copy of this witness' Grand Jury testimony detailing these events to the defense.

14.     The interference by the detectives likewise was exposed before W-3 testified before the Grand Jury. On March 8, 2005, W-3 testified before the Grand Jury consistent with her initial videotaped interview. In the Grand Jury, W-3 explained Detectives Brown and Morales' attempts to shape her testimony. The government has provided a redacted copy of this witness' Grand Jury testimony outlining these events to the defense.

15.     The defendant was arrested on November 25, 2005. He has been indicted on the following counts: Assault with Intent to Kill while Armed; Possession of a Prohibited Weapon; and Obstruction of Justice. Trial in this matter is scheduled for January 3, 2007.

16.     As noted in our opposition to the defendant's motion to dismiss the indictment, the United States believes the defense will attempt to argue that Detectives Brown and Morales directed W-1, W-2 and W-3 "to shape their stories in such a way to implicate [the defendant] in the stabbing of [the decedent]" (Defendant's Motion to Dismiss Indictment ¶ 6), and that the witnesses, had their testimony not been shaped, might have provided exculpatory information. (Defendant's Motion ¶ 7). The defendant argues, therefore, that "the police misconduct in this case can be analogized to cases in which the police deliberately, in bad faith, destroy physical

6

evidence that may have been exculpatory to the defendant during the collection of the evidence."

(Id.) The defendant should be precluded from making such arguments and any others related to

the conduct of Detectives Brown and Morales at trial on the grounds that they are not supported

by the facts and are more prejudicial than probative. Such arguments also likely would be

confusing to a jury, in that they would create a trial-within-a-trial of Detectives Brown and

Morales.

## II. ARGUMENT

17.    Courts have long had the authority to exclude irrelevant evidence. Mitchell v.

United States, 408 A.2d 1213, 1214-1215 (D.C. 1979) (proffered testimony that complaining

witness refused to speak to defense investigator excluded as irrelevant). This authority includes

the ability to preclude cross examination on irrelevant issues. Brown v. United States, 409 A.2d.

1093, 1099 (D.C. 1979) (test is not whether cross examination will shed light on material issue

but if it will assist in evaluating credibility and probative value of direct examination). See also,

Federal Rule of Evidence 402.

18.    Moreover, even relevant evidence may be excluded if its probative value is

substantially outweighed by its prejudicial value or if the evidence's presence will confuse the

jury or waste its time. Johnson v. United States, 683 A.2d 1087, 1099 (D.C. 1996) (en banc)

(adopting Federal Rule of Evidence 403).

19.    Here, the evidence regarding the conduct of Detectives Brown and Morales is not

relevant. While the three witnesses did temporarily change their testimony, within a short time

period each witness reaffirmed (and swore to under oath in the grand jury) the testimony they had

initially told the detectives either on video (for two of the witnesses) or in person (for one).

7

Moreover, each witness' testimony in the grand jury is consistent with what she initially told the

detectives and each witness has freely admitted changing their testimony at the request of the

detectives.[6]  As noted in our opposition to the defendant's motion to dismiss the indictment, the

detective's interference was discovered before any of the witnesses testified in the grand jury

and, for two of the witnesses, was testified to by the witnesses in the grand jury.  Despite that, the

grand jury still voted to indict the defendant and Judge Rhonda Reid Winston found probable

cause to detain the defendant pending his trial.

    20.      From the very beginning, all three of these witnesses stated that they saw the

defendant in a fight with the decedent, and two out of the three saw him swinging at the decedent

with a box cutter.  There was never any question as to whether the defendant was involved in the

attack.  Moreover, in each case, the detectives' interference came after the witnesses had

implicated the defendant. See Government's Opposition to Defendant's Motion to Dismiss

Indictment, ¶¶ 12-15.[7]

### III. CONCLUSION

---

[6] Indeed, each of the witnesses stated that they did not think anything was wrong when the detectives asked them to change their testimony.  They simply thought that the detectives knew better.  It was only when confronted by AUSA Anderson that the witnesses began to suspect something was amiss.

[7] There is one correction to the Government's Opposition to Defendant's Motion to Dismiss Indictment: Paragraph 13 should read as follows: "There is also no evidence that the interference of Detectives Brown and Morales affected W-2's implication of the defendant in the attack.  On February 13 or 14 *[should be February 17]*, 2005, the detectives interviewed W-2 (not on videotape).  She described the fight between the defendant and the decedent.  On February 15, 2005 *[should be February 17, 2005]*, the detectives spoke with the witness and told her to adjust her testimony by describing the defendant's weapon as a 'shiny, metal object'.  That same day, W-2 initially told AUSA Anderson that the defendant had used a shiny, metal object, but – during the same interview – admitted she had changed this detail at the request of Detectives Brown and Morales." The remainder of the paragraph is correct.

8

21.    In each of their initial interviews with the police, all three of the witnesses who have positively identified the defendant stated that they saw the defendant in a fight with the decedent, and two out of the three saw him swinging at the decedent with a box cutter. There was never any question as to whether the defendant was involved in the attack. The U.S. Attorney's Office learned of the attempts by Detectives Brown and Morales to shape the testimony of these witnesses prior to their presentment to the Grand Jury, and each testified fully and truthfully consistent with their original statements. Moreover, each witness is expected to testify to the same facts at trial. Thus the defense should not be permitted to argue that the conduct of Detectives Brown and Morales had any effect on the witnesses' testimony. The record does not support that claim. To permit otherwise would confuse the jury and introduce irrelevant and prejudicial evidence into the trial.

9

WHEREFORE, the government respectfully requests that the government's motion be granted and that the defense be precluded from any mention of the conduct of Detectives Brown and Morales.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

GLENN KIRSCHNER
CHIEF, HOMICIDE SECTION

THOMAS A. DIBIASE
DEPUTY CHIEF, HOMICIDE SECTION

LYNN E. HAALAND #454120
ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
Homicide, Room 9439
555 Fourth St. NW
Washington, DC 20530
(202) 353-8815

10

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the government's opposition to defendant's motion to suppress identifications was served, via fax and email, this _28th_ day of December, upon counsel for defendant as follows:

J. Christopher McKee, Esq.
Elizabeth Mullin, Esq.
Public Defender Service
633 Indiana Ave, NW
Washington, DC 20004
Fax: 202-824-2952
Tel: 202-824-2352

_Haaland_
LYNN E. HAALAND
ASSISTANT UNITED STATES ATTORNEY

11

# EXHIBIT 2

# SUPERIOR COURT OF THE
## DISTRICT OF COLUMBIA – FELONY BRANCH

UNITED STATES OF AMERICA : Criminal Case No. 2005FEL006847
                                  :
vs. : Judge Herbert B. Dixon, Jr.
                                  :
JEROME JONES : Trial date: January 3, 2007

SUPERIOR COURT OF THE
DISTRICT OF COLUMBIA
CASE MANAGEMENT BRANCH
2005 NOV 27 P 3: 55
FILED

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
## TO DISMISS INDICTMENT

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this opposition to defendant's Motion to Dismiss

Indictment because Deliberate Police Misconduct Resulted in an Irreparable Taint to Witness

Testimony (Defendant's Motion). Neither the facts nor the law supports the defendant's claim

that the witnesses were tainted or that the indictment should be dismissed. In support of this

motion, the government relies upon the following points and authorities and any other points and

authorities that may be cited at a hearing on this motion.

## I. BACKGROUND

1. The government expects its evidence to show as follows. On or about February

13, 2005, at approximately 2:45 a.m., the defendant, Jerome Jones, got into a fight at the Club U

nightclub formerly located in the Reeves building at 14th and U Streets, NW, Washington, D.C.

After arguing with the decedent in this case, Terrance Brown, on the dance floor, he stabbed him

multiple times with a short-bladed instrument described by witnesses as a box cutter. One other

individual involved in the fight also had a knife. This man has been described by witnesses as

wearing a black Coogi brand shirt. Security personnel broke up the fight by carrying the

defendant and the decedent out separate entrances. They brought the decedent out near the

Industrial Bank entrance in the Reeves building lobby where he died from his wounds.



Case: 2005 FEL 006847

2.      On February 13, 2005, the lead detectives in the case at the time, Detective Erick

Brown and Detective Milagros ("Millie") Morales, showed W-1 a photo array including the

defendant. W-1 positively identified the defendant. On February 14, 2005, the detectives

interviewed W-1 on videotape and she described what she saw of the fight. She was in the

immediate vicinity with the decedent when the fight broke out. She did not see either the

defendant or the decedent with a weapon. She knew the defendant as "Gerald" from previous

occasions at the club. Prior to the fight, she had seen Gerald at the bar with the black Coogi-

shirted man and provided a detailed physical description of both men. Later that same day – after

showing her the photo array – the detectives again spoke with the witness and told her to adjust

her testimony in the following way: to describe the black Coogi-shirted man as punching the

decedent with both hands, rather than as making a punching motion to the torso with his left

while pulling the decedent down and forward with his right. Meeting with the first prosecutor on

the case, Jennifer Anderson, that same day, February 14, W-1 initially described the black Coogi-

shirted man as punching the decedent with both hands.

3.      The interference by the detectives was exposed before W-1 testified in the Grand

Jury, however. On March 4, 2005, W-1 testified before a Grand Jury consistently with her

videotaped statement. W-1 explained Detectives Brown and Morales' attempts to shape her

testimony and why she first did as they suggested. The government has provided a redacted copy

of this witness' Grand Jury testimony detailing these events to the defense.

4.      On February 13 or 14, 2005, the detectives interviewed W-2 – not on videotape –

and she described what she saw of the fight. She stated that she was 2-4 feet away from the

defendant when he pulled out a box cutter and used it against the decedent. She knew the

2

defendant as Jerome from previous occasions at the club.  W-2 also reported that the day after the

incident, as described in the Affidavit in Support of Arrest Warrant, the defendant called her on

the phone and admitted that he "stabbed the motherfucker." On February 15, 2005, the detectives

spoke with the witness and told her to adjust her testimony by describing the defendant's weapon

as a "shiny, metal object".  That same day, W-2 initially told AUSA Anderson that the defendant

had used a shiny, metal object, but – during the same interview – admitted she had changed this

detail at the request of Detectives Brown and Morales.  On February 18, 2005, Detectives Brown

and Morales showed W-2 the same photo array including the defendant.  W-2 positively

identified the defendant.

5.      The interference by the detectives was exposed before W-2 testified before the

Grand Jury.  On February 18, 2005, W-2 testified before the Grand Jury consistent with her

original statement.  The government has provided a redacted copy of this witness' Grand Jury

testimony detailing these events to the defense.

6.      On February 14, 2005, the detectives interviewed W-3 on videotape and she

described what she saw of the fight.  She knew the defendant as Jerome through W-2 from

previous occasions at the club.  She was approximately 6-7 feet from the defendant when he

pulled out a knife and began throwing punches at the decedent with it.  She provided a detailed

physical description of both the defendant and the black Coogi-shirted man.  That same day,

Detectives Brown and Morales showed W-3 the same photo array including the defendant.  W-3

positively identified the defendant as the person who stabbed the decedent.  On February 14,

2005 – after showing her the photo array – the detectives spoke with the witness and told her to

adjust her testimony in the following way: 1) to describe the defendant's weapon as a shiny

3

object rather than a box cutter; 2) to state that the defendant had made stabbing rather than slicing motions; and 3) to state that she was unsure if other people jumped into the fight, when she had seen others jump in. On February 15, 2005, W-3 reported events to AUSA Anderson as suggested to her by the detectives. She then told AUSA Anderson that she made those changes because the detectives told her to.

7.     The interference by the detectives was exposed before W-3 testified before the Grand Jury. On March 8, 2005, W-3 testified before the Grand Jury consistent with her initial videotaped interview. In the Grand Jury, W-3 explained Detectives Brown and Morales' attempts to shape her testimony. The government has provided a redacted copy of this witness' Grand Jury testimony outlining these events to the defense.

8.     The defendant was arrested on November 25, 2005. He has been indicted on the following counts: Assault with Intent to Kill while Armed; Possession of a Prohibited Weapon; and Obstruction of Justice. Trial in this matter is scheduled for January 3, 2007.

9.     The defendant now moves to dismiss the indictment against him, on the grounds that first, Detectives Brown and Morales directed W-1, W-2 and W-3 "to shape their stories in such a way to implicate [the defendant] in the stabbing of [the decedent]" (Defendant's Motion ¶ 6), and that the witnesses, had their testimony not been shaped, might have provided exculpatory information. (Defendant's Motion ¶ 7). The defendant argues, therefore, that "the police misconduct in this case can be analogized to cases in which the police deliberately, in bad faith, destroy physical evidence that may have been exculpatory to the defendant during the collection of the evidence." (Id.) The defendant's arguments are without merit and should be denied.

4

## II. ARGUMENT

10.      The defendant's argument misses the mark both factually and legally.  As a

factual matter, the interference by Detectives Brown and Morales was exposed <u>before</u> the Grand

Jury voted to indict the defendant.  Thus the Grand Jury heard the witnesses' original statements,

the ways in which the detectives asked them to shape their testimony, and their live testimony –

in which all three testified consistent with their original statements and not according to the

detectives' suggestions – and it still found probable cause to indict.  Given that the Grand Jury

had the full story before it, the witnesses showed they were not tainted.  The indictment therefore

should stand.

<u>The Defendant's Claim is Not Supported by the Facts.</u>

11.      The government makes no attempt to excuse or minimize the fact that Detectives

Brown and Morales attempted to influence the witnesses in order to emphasize the defendant's

role in the offense here.  However, they did not invent the defendant's role as he suggests.  ("The

police knew that the witnesses were implicating someone other than Jerome Jones and yet

directed them to alter their testimony to inculpate Jerome Jones." Defendant's Motion ¶ 9.)

From the very beginning, all three of these witnesses stated that they saw the defendant in a fight

with the decedent, and two out of the three saw him swinging at the decedent with a box cutter.

There was never any question as to whether the defendant was involved in the attack.  Moreover,

in each case, the detectives' interference came <u>after</u> the witnesses had implicated the defendant.

Equally important, with respect to the validity of the indictment, in each case, the detectives'

interference was exposed <u>before</u> the witness testified before the Grand Jury.  Thus the Grand Jury

was able to judge for itself the extent of the detectives' influence on the witnesses, and it still

5

found sufficient evidence to indict.

12.     The chronology of events is as follows.  W-1 selected the defendant's photo, in less than one minute, on February 13, 2005.  W-1 was interviewed by Detectives Brown and Morales on videotape on February 14, 2005 and described the fight between the defendant and the decedent.  Later that same day – after showing her the photo array – the detectives again spoke with the witness and told her to adjust her testimony in the following way: to describe the black Coogi-shirted man as punching the decedent with both hands, rather than as making a punching motion to the torso with his left while pulling the decedent down and forward with his right.  She initially did so, and then explained everything truthfully to AUSA Anderson.  She also testified consistently with her original video statement before the Grand Jury.  See paragraph 3 above.  This change with regard to the actions of the black Coogi-shirted man does not affect W-1's implication of the defendant.

13.     There is also no evidence that the interference of Detectives Brown and Morales affected W-2's implication of the defendant in the attack.  On February 13 or 14, 2005, the detectives interviewed W-2 (not on videotape).  She described the fight between the defendant and the decedent.  On February 15, 2005, the detectives spoke with the witness and told her to adjust her testimony by describing the defendant's weapon as a "shiny, metal object".  That same day, W-2 initially told AUSA Anderson that the defendant had used a shiny, metal object, but – during the same interview – admitted she had changed this detail at the request of Detectives Brown and Morales.  W-2 identified the defendant from the photo array, in less than one minute, on February 18, 2005.  That same day, W-2 testified before the Grand Jury consistent with her original statement.  See paragraph 5 above.  At no time did W-2 state that the defendant was not

6

involved in the fight with the decedent.

14.    W-3's implication of the defendant in the attack likewise came before Detectives

Brown and Morales suggested that she testify in a way that emphasized the defendant's role. On

February 14, 2005, the detectives interviewed W-3 on videotape and she described what she saw

of the fight. She provided a detailed physical description of both the defendant and the black

Coogi-shirted man. On February 14, 2005 – <u>after</u> showing her the photo array – the detectives

spoke with the witness and told her to adjust her testimony in the following way: 1) to describe

the defendant's weapon as a shiny object rather than a box cutter; 2) to state that the defendant

had made stabbing rather than slicing motions; and 3) to state that she was unsure if other people

jumped into the fight. On February 15, 2005, W-3 reported events to AUSA Anderson as

suggested to her by the detectives. She then told AUSA Anderson that she made those changes

because the detectives told her to and subsequently testified truthfully before the Grand Jury.

<u>See</u> paragraph 7 above. At no time did W-3 state that the defendant was not involved in the fight

with the decedent.

15.    The facts show that the full extent of the interference by Detectives Brown and

Morales became known almost immediately. All three witnesses knew the defendant prior to

February 13, 2005. All of them positively identified the defendant as being involved in the attack

on the decedent. There is no evidence that the detectives coerced any witness into identifying the

defendant. The government submits that had the detectives coerced or attempted to coerce any

witness into identifying the defendant, she would have disclosed that fact also.

16.    The defendant's speculation that absent the detectives' interference, the

witnesses might have provided some other vital exculpatory evidence is similarly baseless. From

the beginning, all three placed the defendant at Club U and as taking part in the attack on the decedent. Since the detectives suggested that the witnesses testify to emphasize the defendant's role after their original statements and before their Grand Jury testimony, and each witness testified truthfully before the Grand Jury consistent with their original statements, there is no reason to suppose that any one of them would have exculpated the defendant. They had the opportunity to do so in the Grand Jury and did not. No evidence was "destroyed." (Defendant's Motion ¶ 11.)

<u>The Defendant has Not Met the Legal Standard for Dismissal of the Indictment</u>.

17.    The defendant's argument also fails as a matter of law. In analogizing this case to those where police deliberately destroyed exculpatory evidence (Defendant's Motion ¶¶ 7-9), the defendant sidesteps the legal standard governing exercise of judicial supervisory power over an indictment as established by the Supreme Court in <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250 (1988) and <u>United States v. Williams</u>, 504 U.S. 36 (1992). In <u>Bank of Nova Scotia</u>, the Supreme Court held that in reviewing the validity of an indictment, the harmless error inquiry applies. <u>Id.</u>, 487 U.S. at 256. Thus where a defendant seeks dismissal for nonconstitutional error, a court should dismiss an indictment "only if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." <u>Id.</u> (internal citations omitted). Moreover, the Supreme Court has held that federal courts cannot use their supervisory power to dismiss an otherwise valid indictment for failure to present even substantial exculpatory evidence to the grand jury. <u>Williams</u>, 504 U.S. at 53-54.

18.    The District of Columbia Court of Appeals likewise has employed this standard.

8

In Jones v. United States, 893 F.2d 564, 566 (2006), the court held that "where false material testimony was presented to the grand jury, dismissal [of the indictment] is warranted only where it is established that the false testimony substantially influenced the grand jury's decision to indict or where there exists a grave doubt whether that decision was free from the substantial influence of the false testimony." (Citing Hunter v. United States, 590 A.2d 1048, 1052, internal quotations omitted.) See also Sanders v. United States, 550 A.2d 343, 345 (1988) (finding gross negligence on the part of the prosecutor for presenting false testimony to the grand jury did not warrant dismissal of the indictment, following Bank of Nova Scotia).

19.    The defendant has not met his burden here.  In this case, there was no perjured or false testimony as in Jones or Hunter, where the D.C. Court of Appeals still upheld the indictments.  There was no undisclosed or destroyed exculpatory evidence, which the Williams Court still denied as a basis for dismissal.  The Grand Jury had the opportunity to consider the detectives' interference and still found probable cause to indict.  Thus the defendant suffered no prejudice.  Without proof of harm to the defendant, the indictment should stand.  Bank of Nova Scotia, 487 U.S. at 254.

20.    The case law specifically addressing police misconduct in the context of dismissal of an indictment also does not lend support to the defendant.  Police misconduct may result in dismissal where the misconduct is so "outrageous" or it "shocks the conscience" to such a degree that it deprives the defendant of his due process rights.  See, e.g., Rochin v. California, 342 U.S. 165 (1952) (finding that it shocked the conscience when police forced the defendant's stomach to be pumped following a warrantless search).  While not condoning the detectives' conduct here, the defendant has not made a case for a deprivation of his due process rights.  The

9

Grand Jury had sufficient evidence to indict.

## III. CONCLUSION

21.     In each of their initial interviews with the police, all three of the witnesses who have positively identified the defendant stated that they saw the defendant in a fight with the decedent, and two out of the three saw him swinging at the decedent with a box cutter.  There was never any question as to whether the defendant was involved in the attack.  The U.S. Attorney's Office learned of the attempts by Detectives Brown and Morales to shape the testimony of these witnesses prior to their presentment to the Grand Jury, and each testified fully and truthfully consistent with their original statements.  Thus the defendant was not prejudiced by the detectives' interference, there is no reason to believe that the witnesses had more exculpatory evidence that they did not provide, and the indictment is not flawed in any way. Neither the facts nor the law supports dismissal of the indictment here or any other sanction.

WHEREFORE, the government respectfully requests that the defendant's motion be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

GLENN KIRSCHNER
CHIEF, HOMICIDE SECTION

DAVID GORMAN
DEPUTY CHIEF, HOMICIDE SECTION

THOMAS A. DIBIASE
ASSISTANT U.S. ATTORNEY

LYNN E. HAALAND #454120
ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
Homicide, Room 9439
555 Fourth St. NW
Washington, DC 20530
(202) 353-8815

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the government's opposition to defendant's motion to suppress identifications was served, via fax and mail, this 27th day of November, upon counsel for defendant as follows:

J. Christopher McKee, Esq.
Elizabeth Mullin, Esq.
Public Defender Service
633 Indiana Ave, NW
Washington, DC 20004
Fax: 202-824-2952
Tel: 202-824-2352

LYNN E. HAALAND
ASSISTANT UNITED STATES ATTORNEY

11